UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>JUAN CARLOS GUTIERREZ,<br><br>　　　　Defendant. | Case No. 2:23-cr-00197-SB-1<br><br>ORDER DENYING MOTION TO DISMISS THE INDICTMENT AND GRANTING ALTERNATIVE MOTION TO ISSUE ADVERSE JURY INSTRUCTION [DKT. NO. 71] |

　　　　In the early morning of December 10, 2021, the staff at drug rehabilitation facility Safe Refuge found one of its residents, S.R., dead on the floor from an apparent fentanyl overdose.  Hours earlier, S.R. had received a delivery of fentanyl from Jayleen Feusier, who had in turn procured the fentanyl from her supplier, Defendant Juan Carlos Gutierrez.  When the police collected evidence from the scene, they gathered a piece of tinfoil and a short straw-like object from the floor near where S.R. laid and a small clear bag of fentanyl from a shoebox in S.R.'s possession.  But they did not preserve the shoebox in which the bag of fentanyl was found or any of its other contents.  Contending that the shoebox and its other contents would have provided evidence that the fentanyl S.R. used before his death was not the fentanyl Gutierrez had supplied, Gutierrez moves to dismiss the indictment on the grounds that the government destroyed evidence material to his defense.  The Court heard argument on the motion on March 28, 2024, followed by an evidentiary hearing on May 7.  Because Gutierrez has not shown that the evidence was materially exculpatory or that the government acted in bad faith, the Court denies the motion to dismiss the indictment but grants Gutierrez's alternative request for a jury instruction on the preservation issue.

1

I.

The indictment charges Gutierrez with a single count of distribution of fentanyl resulting in death based on the theory that he supplied fentanyl to codefendant Feusier, who then sold it to S.R., who died hours after receiving it. Dkt. No. 1; 21 U.S.C. § 841(a)(1), (b)(1)(c). Gutierrez claims that S.R. had multiple sources of fentanyl,[1] and that the fentanyl S.R. used before his death was not the fentanyl sold to him by Feusier. Dkt. No. 71.

On December 9, 2021, Feusier sold S.R. a small ziplock bag of fentanyl through an Uber delivery. Before delivery, she put turquoise tissue paper inside a small brown cardboard box, placed the bag of fentanyl inside the box, wrapped the box in one of her black t-shirts, and placed the box (along with some tinfoil) inside a shoebox that was delivered by Uber to S.R. At about 11:00 p.m., S.R. retrieved the package from the Uber and returned inside. That night, S.R. attempted to fall asleep on the living room floor. Safe Refuge staff interacted with him at 11:25 p.m. and again at 1:07 a.m. before observing him apparently asleep at 3:13 a.m. At 5:45 a.m., S.R.'s roommates discovered that he had vomited and was unresponsive, and they notified staff members, who called 9-1-1. S.R. was pronounced dead by responding paramedics at 6:25 a.m. The coroner investigator collected a piece of burnt tinfoil and a small straw-like object found near his body.

What was not then collected, however, was a shoebox under a coffee table a few feet away from S.R.'s dead body. That shoebox was discovered later that afternoon by Safe Refuge staff member Marvin Browder. Browder recognized it as a shoebox that S.R. frequently carried around the house—apparently a separate shoebox from the one Feusier had sent to him—and observed that it contained a woman's top,[2] tinfoil, and a clear plastic bag containing what appeared to be drugs. Dkt. No. 71-2 at 10. Browder called the police. At 4:30 p.m., Officer Frank

---

[1] Shortly before his death, S.R. searched the internet on his phone for information about how long fentanyl is detectible in a urine sample and for information about withdrawal symptoms before use. His messaging history indicates that he previously had received fentanyl from a source other than Feusier while at the rehabilitation facility.

[2] A photograph showing the shoebox also depicts a black shirt on the ground. Dkt. No. 71 at 10; Dkt. No. 75 at 16; *see also* Dkt. No. 71-8 ¶¶ 5, 8 (referencing the black shirt in DEA report); Dkt. No. 71-9 ("S.R.'s family mention[ed] a female black shirt found amongst S.R.'s belongings.").

Nogales of the Long Beach Police Department arrived at Safe Refuge, collected the small ziplock bag containing fentanyl, and booked it into evidence at the police station. Officer Nogales did not photograph the box or its contents and did not record the collection on his body-worn camera. The box and its contents (other than the small bag of drugs) were not booked into evidence.[3]

Alleging that the destruction of the shoebox and its contents deprived him of evidence necessary to his defense, Gutierrez now moves to dismiss the indictment or, in the alternative, for an adverse jury instruction.

II.

A defendant may move to dismiss the indictment when the government destroys evidence or allows evidence to be destroyed. *See California v. Trombetta*, 467 U.S. 479, 488–89 (1984) (defining standard for when destroyed evidence rises to a due process violation). If the destroyed evidence was materially exculpatory and the defendant is unable to obtain comparable evidence, dismissal is warranted. *Id.*; *accord United States v. Del Toro-Barboza*, 673 F.3d 1136, 1149 (9th Cir. 2012). If the destroyed evidence was potentially useful (but not materially exculpatory) and there is no comparable substitute evidence, then dismissal is only warranted if the government acted in bad faith. *United States v. Zaragoza-Moreira*, 780 F.3d 971, 977–78 (9th Cir. 2015); *Arizona v. Youngblood*, 488 U.S. 51, 57 (1988).

Gutierrez argues that the destruction of the shoebox—and its contents other than the bag of drugs—deprived him of evidence that was materially exculpatory, or, at the very least, potentially useful. In his reply, Gutierrez argues that the government's opposition concedes that the shoebox was not the same as the one sent by Feusier, which makes the evidence materially exculpatory because it would have shown that the drugs in it were not the drugs sent by Feusier. Dkt. No. 86 at 5 ("Here, we know that the destroyed shoebox was not the same shoebox sent by Feusier, so Mr. Gutierrez's defense is that the drugs that were collected were completely different drugs from any Feusier sent."). This argument overlooks that S.R. may have received the drugs in Feusier's shoebox and then placed them in his own shoebox, in which he was apparently known to keep his things. The existence

---

[3] While the parties dispute whether Officer Nogales left the box at Safe Refuge or took it with him, they agree the box was destroyed and not booked into evidence.

of a shoebox other than Feusier's—especially one known to contain S.R.'s possessions—does not exculpate Gutierrez.

In his motion and again at the hearing, Gutierrez argued that the shoebox is materially exculpatory evidence under *United States v. Johnson*, 996 F.3d 200, 216 (4th Cir. 2021). In *Johnson*, the defendants were charged with distributing heroin resulting in death. The Fourth Circuit vacated a district court's finding that a decedent's cell phone contained only potentially useful evidence, where the investigator knew the decedent "had sent multiple texts seeking to purchase drugs from at least two sources other than the defendants" shortly before his death. *Id.* at 207, 209. The Fourth Circuit was "troubled" by the district court's finding, given that "the Government conceded that the cell phone had at least some content with apparent exculpatory value, i.e., the 'laced blunt' text indicating that [the decedent] smoked a laced blunt in addition to snorting the defendants' alleged heroin shortly before his death." *Id.* at 216. Here, by contrast, Gutierrez cannot identify any exculpatory evidence in or on the shoebox. Instead, he argues that the shoebox *could have been* useful to him for a number of reasons: his fingerprints and DNA might not have been found on or anywhere in the shoebox (Dkt. No. 71 at 11); the shoebox might not have contained the brown box and turquoise tissue paper used by Feusier (*id.*); or the shoebox might have contained evidence of drugs originating from other dealers (*see* Dkt. No. 86 at 5–6). All these theories, however, are based on speculative possibilities. Thus, while the shoebox might have proved to be useful to the defense, its usefulness is "potential."[4]

Because the evidence at issue is only potentially useful, the Court cannot dismiss the indictment unless Gutierrez shows the government acted in bad faith. Bad faith requires that "the government[] know[] of the apparent exculpatory value of the evidence at the time it was lost or destroyed." *Zaragoza-Moreira*, 780 F.3d at 979. It is not enough to show that the government was negligent or even reckless. *Del Toro-Barboza*, 673 F.3d at 1150. At the evidentiary hearing,

---

[4] This case is also distinguishable from *Johnson* in that the record here has been fully developed. *Compare Johnson*, 996 F.3d at 216 ("conclud[ing] that the district court erred by relying on an incomplete evidentiary record" and remanding for further proceedings).

4

Gutierrez may have established negligence, but he did not show that Officer Nogales acted in bad faith.

When Officer Nogales arrived at Safe Refuge, he was responding to a service call, sent by police dispatch, to retrieve "abandoned property, believed to be narcotics and belonging to a recently deceased client." Dkt. No. 71-19 ¶¶ 5; *see also* Dkt. No. 71-10 (police call history: "Resident of drug rehab passed away this morning and [reporting party] just found a box with drugs in it he would like picked up."). He was not responding to a call to collect evidence in a suspected criminal case. Dkt. No. 71-12 at 2 (Long Beach Police Department property report: box checked next to "Found" and box not checked next to "Evidence"); Dkt. No. 71-12 at 3 (report receipt: describing type of incident as "Found Property"); Dkt. No. 71-10 (police call history categorizing call type as "Found Property"); *see also* Dkt. No. 71-19 (DEA interview: "Officer Nogales stated he had no reason to believe [the shoe box] was part of any crime."). Officer Nogales testified that the nature and focus of these two service calls differ and require different procedures, including whether a body worn camera must be activated. *See* Dkt. No. 71-21 at 3–4 (policy requires activation during "enforcement related contacts"). Because Officer Nogales was responding to a call to retrieve property rather than to collect evidence, he did not perceive any evidentiary value in the shoebox. Moreover, neither Officer Nogales nor anyone in law enforcement knew that Feusier and Gutierrez were potential criminal suspects until more than a year later, when S.R.'s phone was searched. In these circumstances, Gutierrez cannot show that Officer Nogales should have known at the time of retrieval the specific relevance of the shoebox apart from its drug contents—and it is still not clear that the shoebox has any exculpatory value. This distinguishes all the cases upon which Gutierrez relies. *See, e.g.*, *Zaragosa-Moreira*, 780 F.3d at 976–77 (concluding that the federal agent knew of the potentially exculpatory value of the destroyed recording based on his prior interview of the suspect who "repeatedly alerted [him] to her duress claim and the potential usefulness of the . . . footage"); *United States v. Cooper*, 983 F.2d 928, 929–31 (9th Cir. 1993) (government agents knew of exculpatory value of laboratory equipment based on repeated assertions of legitimacy from parole officer, landlord, and defense counsel); *United States v. Soriano*, 401 F. Supp. 3d 396, 402 (E.D.N.Y. 2019) (case agent destroyed contents of defendant's luggage contrary to express directive from superiors and "right after hearing [defendant's] explanation of her . . . business, so he knew, or should have known . . . how valuable the contents of her luggage were to her defense"); *Johnson*, 996 F.3d at 216 (investigating agent returned phone to decedent's family despite knowing that it contained text messages referencing use of other drugs hours before decedent's death).

Finally, Gutierrez argues that the lack of body worn camera footage demonstrates bad faith. Officer Nogales testified that he did not activate his body worn camera despite his contrary report to dispatch, and that the contrary report resulted from a mistaken entry into the dispatch system. At the evidentiary hearing, Gutierrez did not dispute the fact that Officer Nogales had not recorded the evidence retrieval. He instead argued that Officer Nogales attempted to cover up the fact that he had forgotten to record by falsely reporting that he had activated his camera. But even if true, this allegation would not demonstrate the type of bad faith necessary to dismiss the indictment, because the alleged wrongdoing did not result in the failure to preserve evidence or reflect any awareness that the shoebox had exculpatory value. *Zaragoza-Moreira*, 780 F.3d at 980 ("[W]ithout knowledge of the potential usefulness of the evidence, the evidence could not have been destroyed in bad faith."). Indeed, Gutierrez concedes the failure to record was simply inadvertent. Thus, the Court does not find bad faith from the lack of body worn camera footage.

Because Gutierrez has not shown bad faith, the Court denies his request to dismiss the indictment.

### III.

A district court has discretion to give an adverse jury instruction when the government destroys potentially useful evidence even if the destruction was not done in bad faith. *United States v. Sivilla*, 714 F.3d 1168, 1173 (9th Cir. 2013). In deciding whether to exercise its discretion, the district court should consider both the "quality of the government's conduct" and "the prejudice to the defendant." *Id*.

*Sivilla* contained a non-exhaustive list of factors used in evaluating the government's conduct, including: whether the evidence was in government custody at the time it was destroyed; whether the government acted with disregard for the interests of the accused; whether the government was negligent in failing to adhere to its standards of care; whether the destruction of the evidence was deliberate; and whether government attorneys participated in the events leading up to the loss. *Id.* at 1173. Here, the government receives a mixed report. On the one hand, the government did not specifically disregard the interests of anyone accused, the destruction of evidence was not deliberate in any malicious sense, and government attorneys bear no responsibility for the loss. On the other hand, the evidence was either in government custody when it was destroyed, or it was not in government custody at the time because Officer Nogales failed to take possession of it. Either way, it was negligent not to collect and book the shoebox and its

6

contents into evidence in the event of a future prosecution. Even though Officer Nogales was dispatched to retrieve property rather than collect evidence, he knew that a person at Safe Refuge had just died from a drug overdose, and he knew that the drugs had belonged to the decedent.

*Sivilla* also identified four non-exclusive factors used to evaluate the prejudice to the defendant: the centrality of the evidence to the case; the probative value and reliability of the substitute evidence available in the case; the weight of inferences or proof allegedly lost to the defendant; and "the probable effect on the jury [of the] absence of the evidence, including dangers of unfounded speculation and bias that might result to the defendant." *Id.* at 1173–74. These factors are difficult to measure in the absence of more concrete information about the contents of the shoebox—a problem created by the failure to secure it. While there is a photograph of the outside of the shoebox and Browder's description of its contents ("a woman's top, tin foil and a white substance that was as hard as a small piece of chalk," Dkt. No. 71-2 at 10), there is no fully adequate substitute evidence that would allow a full examination by the defense of an issue that is central to the indictment (i.e., the source of the fentanyl).

On balance, the Court finds that a jury instruction based on the Ninth Circuit's Model Criminal Jury Instruction 3.19 is appropriate. The following instruction will therefore be given: "If you find that the government intentionally destroyed or failed to preserve the shoebox and its contents found at Safe Refuge and that the government knew or should have known it would be evidence in this case, you may infer, but are not required to infer, that this evidence is unfavorable to the government." The Court declines to impose Gutierrez's further requested sanction of suppression of the evidence based on the balance of the *Sivilla* factors. *See United States v. Flyer*, 633 F.3d 911, 916 (9th Cir. 2011) (denying suppression where balance of factors evidenced negligence rather than bad faith). Unlike the suppression remedy, the jury instruction is measured and provides guidance to the jury that undoubtedly will be faced with a substantial challenge to the government's failure to preserve the shoebox as found by Officer Nogales.[5]

---

[5] Gutierrez also argues in the alternative for exclusion of the bag of drugs collected from the shoebox under Federal Rule of Evidence 403. Dkt. No. 71 at 17. Because the probative value of the bag of drugs is not substantially outweighed by the prejudice to Gutierrez of not having the shoebox it was contained in, the Court denies the request for exclusion.

IV.

The Court DENIES Gutierrez's motion to dismiss the indictment but GRANTS his motion in the alternative for an adverse jury instruction.

Date: May 29, 2024

_____
Stanley Blumenfeld, Jr.
United States District Judge