E. MARTIN ESTRADA
United States Attorney
LINDSEY GREER DOTSON
Assistant United States Attorney
Chief, Criminal Division
JEREMY K. BEECHER (Cal. Bar No. 301272)
Assistant United States Attorney
International Narcotics, Money Laundering & Racketeering Section
DANBEE C. KIM (Cal. Bar. No. 350014)
Assistant United States Attorney
Environmental Crimes and Consumer Protection Section
 1400 United States Courthouse
 312 North Spring Street
 Los Angeles, California 90012
 Telephone: (213) 894-5429/6530
 Facsimile: (213) 894-0141
 E-mail:  jeremy.beecher@usdoj.gov
     danbee.kim2@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## UNITED STATES DISTRICT COURT

### FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>   Plaintiff,<br><br>   v.<br><br>JUAN CARLOS GUTIERREZ,<br> aka "Johnny G,"<br><br>   Defendant. | Case No. 2:23-CR-197-SB-1<br><br>UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL UNDER FED. R. CRIM. P. 29 (Dkt. No. 269)<br><br>Hearing Date: February 4, 2025<br>Hearing Time: 8:00 a.m.<br>Location: Courtroom of the Hon.<br>     Stanley Blumenfeld Jr. |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Jeremy K. Beecher and Danbee C. Kim, hereby opposes Defendant Juan Carlos Gutierrez's Motion for Judgment of Acquittal Under Fed. R. Crim. P. 29 (Dkt. No. 269).

The United States' Opposition is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: January 7, 2025              Respectfully submitted,

                                    E. MARTIN ESTRADA
                                    United States Attorney

                                    LINDSEY GREER DOTSON
                                    Assistant United States Attorney
                                    Chief, Criminal Division


                                    ____/s/_____
                                    JEREMY K, BEECHER
                                    DANBEE C. KIM
                                    Assistant United States Attorneys

                                    Attorneys for Plaintiff
                                    UNITED STATES OF AMERICA

# **TABLE OF CONTENTS**

DESCRIPTION                                                                                          PAGE

TABLE OF AUTHORITIES ................................................................................................. iii

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................... 1

I.      INTRODUCTION ..................................................................................................... 1

II.     SUMMARY OF EVIDENCE AT TRIAL ............................................................... 1

        A.      Defendant and Feusier Have a Longtime Drug-Trafficking Relationship ............................................................................................. 1

        B.      Feusier Obtains Fentanyl from Defendant and Delivers It to S.R. ............... 2

        C.      S.R. is Found Dead Next to Drug Paraphernalia and Feusier's T-Shirt ....... 3

        D.      The Bag of Fentanyl Sent by Feusier Is Recovered at S.R.'s Residence ................................................................................................ 4

        E.      S.R.'s Blood Tests Positive for Fentanyl ...................................................... 4

        F.      LACME's Chief Toxicologist Confirms the Level of Fentanyl in S.R.'s Blood Is Lethal in a Naïve User ......................................................... 5

        G.      LACME Deputy Medical Examiner Juan Carrillo Concludes S.R. Died of Fentanyl Toxicity ................................................................................ 6

        H.      Defense Expert Dr. Andrew Baker Agrees the Level of Fentanyl in S.R.'s Blood is Ordinarily Lethal and That S.R.'s Case Is an "Easy" One ....................................................................................................... 8

        I.      Safe Refuge Records Show S.R. Had No Health Problems, Took Medications in a Controlled Manner, and Was Not Using Illicit Drugs ..... 9

III.    LEGAL STANDARD ............................................................................................... 9

IV.     ARGUMENT .......................................................................................................... 11

        A.      The Evidence in the Light Most Favorable to the Government Compels the Denial of Defendant's Rule 29 Motion ................................ 11

        B.      A Rational Trier of Fact Could Have Determined that Defendant Distributed Fentanyl ............................................................................. 11

        C.      A Rational Trier of Fact Could Have Determined that the Fentanyl Distributed by Defendant Caused S.R.' S Death ......................................... 14

        D.      A Rational Trier of Fact Could Have Determined that the Fentanyl Distributed by Defendant Caused S.R.' S Serious Bodily Injury .............. 19

V.      CONCLUSION ....................................................................................................... 20

## **TABLE OF CONTENTS (CONTINUED)**

DESCRIPTION                                                                                     PAGE

CERTIFICATE OF COMPLIANCE WITH C.D. CAL. R. 11-6.2.................................21

# <u>TABLE OF AUTHORITIES</u>

<u>DESCRIPTION</u>                                                                     <u>PAGE</u>

<u>CASES</u>:

*Jackson v. Virginia*,
    443 U.S. 307 (1979) ..................................................................... 10, 11

*McDaniel v. Brown*,
    130 S. Ct. 665 (2010) ........................................................................ 10

*Krieger v. United States*,
    842 F.3d 490 (7th Cir. 2016) ........................................................ 17, 18

*United States v. Begay*,
    673 F.3d 1038 (9th Cir. 2011) ........................................................... 10

*United States v. Davis*,
    970 F.3d 650 (6th Cir. 2020) ............................................................. 16

*United States v. Dreitzler*,
    577 F.2d 539 (9th Cir. 1978) ............................................................. 12

*United States v. Lewis*,
    787 F.2d 1318 (9th Cir. 1986) ........................................................... 10

*United States v. Nevils*,
    598 F.3d 1158 (9th Cir. 2010) ................................................ 10, 11, 19

*United States v. Pelisamen*,
    641 F.3d 399 (9th Cir. 2011) ............................................................. 10

*United States v. Reed*,
    575 F.3d 900 (9th Cir. 2009) ............................................................... 9

*United States v. Rocha*,
    598 F.3d 1144 (9th Cir. 2010) ............................................................. 9

*United States v. Solorio*,
    669 F.3d 943 (9th Cir. 2012) ............................................................. 10

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                                      PAGE

STATUTES:

21 U.S.C. § 802(25) ...........................................................................................19

RULES:

Fed. R. Crim. P. 29..................................................................................passim

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

On December 9, 2021, defendant Juan Carlos Gutierrez, a longtime fentanyl dealer, distributed fentanyl to co-defendant Jayleen Feusier.  Feusier sold a portion of that fentanyl to victim S.R., who lived in a Long Beach drug rehabilitation center.  S.R. took the fentanyl and promptly died, with fatal levels of fentanyl in his blood and no other apparent cause of death.  The Los Angeles County Medical Examiner's Office ("LACME") determined that S.R. died of a fentanyl overdose.

In July 2024, a jury convicted defendant of distribution of fentanyl and found that the fentanyl he distributed to Feusier, and that she in turn distributed to S.R., caused S.R.'s death and serious bodily injury.  There was no evidence in the record suggesting S.R. died of any other cause.

Defendant now moves for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29.  In doing so, defendant recycles his trial arguments that the jury considered and rejected.  Because a rational jury could have found beyond a reasonable doubt that defendant distributed fentanyl and that such distribution caused S.R.'s death and serious bodily injury, the Court should deny defendant's Motion.

## II.    SUMMARY OF EVIDENCE AT TRIAL

### A.    Defendant and Feusier Have a Longtime Drug-Trafficking Relationship

As of December 2021, defendant was Feusier's long-standing fentanyl dealer and co-conspirator in drug-trafficking activities.  They had known each other for over a decade.  (6/27/24 Tr., Dkt. 243, at 88:23-24.)  Feusier initially purchased heroin from defendant before transitioning to fentanyl.  (Id. at 90:4-12.)  Defendant sold Feusier fentanyl approximately every other day over the course of seven years.  (Id. at 90:18-24.)  Feusier always paid defendant for the fentanyl she obtained from him, either with cash or by trading items such as electronics.  (Id. at 92:14-93:3; Ex. 276 at 6.)  In addition to purchasing fentanyl for her own use, Feusier also facilitated other drug sales for

defendant, and introduced him to potential drug suppliers, in order to improve her own relationship with him.  (6/27/24 Tr. at 90:25-91:24; see also Exs. 270, 275.)

## B.    Feusier Obtains Fentanyl from Defendant and Delivers It to S.R.

On December 9, 2021, S.R. reached out to Feusier, his childhood friend, via Facebook regrading obtaining fentanyl.  (6/27/24 Tr. at 116:18-24, 128:13-129:8; Ex. 114 at 6-9.)  At the time, S.R. lived at the Safe Refuge drug rehabilitation home in Long Beach.  Feusier agreed to sell S.R. for $60, which S.R. paid her via CashApp.  (6/27/24 Tr. at 185:1-3; Exs. 114 6-9, 120.)  Feusier told S.R. she would get the fentanyl from her "connect," meaning drug source, and break off a "chunk" for him.  (6/27/24 Tr. at 130:10-132:6; Ex. 114 at 6-9.)

Concurrently, Feusier had been discussing with defendant obtaining fentanyl from him.  (6/27/24 Tr. at 120:20-121:3; Ex. 277 at 1.)  Defendant sent Feusier $20 on CashApp so she could take an Uber to his home in Montebello.  (6/27/24 Tr. at 125:18-126:24; Ex. 277 at 8-10; Ex. 120.)  When Feusier arrived, defendant was not yet home, so she waited outside for him.  (6/27/24 Tr. at 127:9-128:8; Ex. 277 at 12-13.)  Later that evening, inside defendant's home, defendant gave Feusier three or four grams of fentanyl, and baggies so she could package it.  (6/27/24 Tr. at 131:8-12; 138:3-23, 138:25-139:8.)  Feusier smoked some of it at defendant's home.  (Id. at 139:12-13.)  S.R. became progressively anxious and desperate to hear back from Feusier, who had stopped replying to his messages.  (Ex. 114 at 22-24; 6/27/24 Tr. at 133:21-24.)  S.R called Feusier repeatedly and sent her message after message inquiring as to her status.  (Ex. 114 at 22-24.)

Feusier eventually reached back out to S.R. and told him she would send him the fentanyl via Uber.  (6/27/24 Tr. at 140:3-14; Ex. 114 at 24.)  Feusier broke off approximately a gram of the fentanyl defendant provided her, packaged it in small plastic baggie, and placed the baggie, a piece of foil, and a lighter into a small box.  (6/27/24 Tr. at 139:9-141:23.)  Feusier sent S.R. photographs of the packaging, wrapped the small box with a black t-shirt to mask the contents, ordered an Uber Connect, and

placed it in the backseat to be delivered to S.R. at Safe Refuge. (Ex. 114 at 24-30.)
Feusier sent a link to S.R. so he could track the Uber as it traveled to him. (Id. at 30-31.)

Uber records show the Uber Connect left defendant's home at 10:36 p.m. and
arrived at Safe Refuge at 11:00 p.m. (Ex. 111; 6/26/24 Tr., Dkt. 241, at 131:11-23,
134:19-135:7.) Safe Refuge surveillance video shows that approximately 11:00 p.m., a
man exited S.R.'s residence, approached a car, and ran back inside with an object in his
hands. (6/27/24 Tr. at 217:20-221:1)

Uber records show Feusier remained at defendant's home until 3:37 a.m., when
she returned to her home in South Gate. (6/26/24 Tr. at 135:23-136:6; Ex. 111.)

**C.    S.R. is Found Dead Next to Drug Paraphernalia and Feusier's T-Shirt**

The night of December 9, 2021, into the early morning of December 10, 2021, a
Safe Refuge monitor conducted periodic house checks, including at S.R.'s residence.
(6/27/24 Tr. at 233:25-236:4; Ex. 244.) At approximately 11:25 p.m., 1:07 a.m., and
3:13 a.m., the Safe Refuge monitor observed S.R. asleep in his residence. (Id.)

Around 5:30 a.m., Safe Refuge monitor Vanessa Reveles received a report of an
emergency in S.R.'s residence. (6/24/24 Tr., Dkt. 237, at 24:4-16.) Reveles ran to the
residence and called 911. (Id.) She found S.R. cold and lifeless, with no pulse and
"foam all over his mouth." (Id. at 24:19-25:2, 26:19-27:3.) She observed around S.R.'s
body a lighter, a piece of foil, and a straw, which Reveles understood to be drug
paraphernalia. (Id. at 27:4-17; Exs. 226, 228.) Following 911 instructions, Reveles
commenced CPR; when she did so, vomit began emanating from S.R.'s body, followed
by clear liquid, both different from the foam she initially observed. (6/24/24 Tr. at
25:13-20, 40:16-22.) Paramedics ultimately arrived on scene and took over resuscitation
efforts. (Id. at 30:5-12.) 4

LACME investigator Raylene Reynolds responded to the scene. Upon her arrival,
she saw S.R.'s body and, next to it, foil, two tubes, and a lighter, which Reynolds
understood to be drug paraphernalia. (Id. at 45:9-15, 48:4-25, 49:14-20; Ex. 209.) She
also observed the t-shirt Feusier used to deliver the fentanyl and paraphernalia. (6/24/24

Tr. at 51:22-52:1; 6/27/24 Tr. at 144:6-16 [Feusier identifying t-shirt in crime scene photograph as having been sent by her].)  Reynolds observed no trauma to S.R.'s body. (6/24/24 Tr. at 47:4-22.)

The parties stipulated that the foil found next to S.R.'s body had fentanyl on it, and that one of the two plastic tubes found near S.R.'s body had fentanyl residue on it. (Dkt. 142 at 2.)

### D.    The Bag of Fentanyl Sent by Feusier Is Recovered at S.R.'s Residence

On December 10, 2023, after LACME had taken S.R.'s body, S.R.'s family members arrived at Safe Refuge and asked to see where he had died.  (6/28/24 Tr., Dkt. 267, at 7:4-20.)  Safe Refuge staff member Marvin Browder escorted the family into the living room, where he noticed a shoebox under the coffee table near where S.R.'s body was found.  (Id. at 7:18-8:5; Ex. 235.)  Browder recognized the shoebox because he had seen S.R. with it before.  (Id. at 8:15-25.)  Browder opened the shoebox and saw a clear plastic baggie containing a white substance that appeared to be drugs.  (Id. at 10:4-16.)  Browder called 911, and when Long Beach Police Officer Frank Nogales arrived, Browder directed him to the shoebox containing the drugs.  (Id. at 10:17-11:1.)  Officer Nogales secured the baggie of drugs, transported it to the police department, and booked it into property.  (Id. at 21:18-22:2, 22:23-23:5.)

Long Beach Police Department Criminalist Gregory Gossage subsequently determined that the white substance inside the baggie found near S.R.'s body consisted of fentanyl.  (6/27/24 Tr. at 261:9-11; Ex. 186.)  Gossage photographed the baggie of fentanyl; the photograph appears identical to the photograph Feusier sent S.R. showing him the baggie of fentanyl she sent him via Uber.  (Exs. 186 at 2, 114 at 27.)

### E.    S.R.'s Blood Tests Positive for Fentanyl

The parties stipulated that on the day following S.R.'s death (when the LACME drew S.R.'s blood for testing), his blood contained 14 ng/mL of fentanyl in his jugular vein and 5.4 ng/mL of fentanyl in his femoral artery, and did not contain the other "drugs of abuse" screened for by LACME, namely, alcohol/ethanol, benzodiazepines, cocaine

and metabolites, methamphetamine, MDMA, or the opiates codeine, morphine, hydrocodone, hydromorphone, or phencyclidine.  (Dkt. 142 at 2.)

### F.   LACME's Chief Toxicologist Confirms the Level of Fentanyl in S.R.'s Blood Is Lethal in a Naïve User

Dr. Rakhshanda Javed, a toxicologist and Chief of LACME's Forensic Sciences Laboratories Division, testified that fentanyl is a powerful synthetic opioid that is 50 times more potent than heroin and 100 times more potent than morphine.  (6/26/24 Tr. at 186:10-187:11.)  When not used in a controlled situation, fentanyl causes death by overwhelming the pulmonary system, such that the victim's lungs fill with fluid and pulmonary edema occurs, which in layperson's term is drowning in one's own lung fluid.  (Id. at 188:3-14.)  When lung fluid reaches the air by leaving the nose and mouth, foaming occurs; that is a telltale characteristic of a fentanyl overdose.  (Id. at 188:15-189:8.)  Dr. Javed testified that a photograph of S.R. taken at the scene of his death was consistent with his having undergone pulmonary edema.  (Id. at 199:14-24.)

Smoking fentanyl causes it to impact the user more quickly than ingestion in pill form.  (Id. at 192:4-15.)  Dr. Javed testified that the differing fentanyl concentration levels between the femoral artery and jugular vein blood samples taken from S.R. demonstrate that the fentanyl had a "quick adverse effect" on him.  (Id. at 196:19-197:13.)

Dr. Javed noted that fentanyl users can build tolerance when consistently using it, however, tolerance is quickly lost during a period of abstinence.  (Id. at 193:7-22.)  If a habitual user ceases using fentanyl for a period of weeks, or uses it only once or twice during that stretch, any tolerance they developed to fentanyl will be lost and fentanyl will impact them as a naïve user.  (Id. at 198:3-23.)

Dr. Javed testified that the levels of fentanyl found in S.R.'s blood are lethal in a naïve user.  (Id. at 197:3-18.)

G.    **LACME Deputy Medical Examiner Juan Carrillo Concludes S.R. Died of Fentanyl Toxicity**

LACME Deputy Medical Examiner Dr. Juan Carrillo, M.D., testified regarding his work on S.R.'s case.  Upon receiving S.R.'s case, he reviewed investigator Reynolds' report, including interviews of witnesses, and the photographs she had taken at the scene. (6/27/24 Tr. at 29:22-30:7.)  Reynolds reported that there were no signs of foul play; no injuries on the body; drug paraphernalia present at the scene; and the victim had a history of drug use, all of which was suggestive of a drug overdose case.  (Id. at 30:8-16.)

Dr. Carrillo then performed his own external examination of all areas of the body for signs of possible foul play or any other type of injury or natural disease.  (Id. at 30:17-24, 31:5-15.)  He observed none.  (Id. at 31:16-17.)  Based on those factors and the presence of drug paraphernalia at the scene, pursuant to LACME protocol, Dr. Carrillo tested S.R.'s urine for major controlled substances.  (Id. at 31:22-32:16.)  The test was positive for fentanyl.  (Id.)  Dr. Carrillo then took tissue and blood samples from the body and ordered the drugs of abuse toxicology screen, which he felt was appropriate given the information collected at the death scene was consistent with a drug overdose, as were his external examination and the positive preliminary screen for fentanyl. (6/27/24 Tr. at 32:18-34:9.)

As set forth in the parties' stipulation, toxicology testing determined that S.R.'s blood contained 14 ng/mL of fentanyl in his jugular vein and 5.4 ng/mL of fentanyl in his femoral artery, and that his blood did not contain the other "drugs of abuse" tested for.  (Id. at 35:1-9.)  Dr. Carrillo testified that the fatal concentration of fentanyl begins at 3 ng/mL, and that S.R.'s fentanyl concentration, being multiples higher than that, was well within the fatal range.  (Id. at 36:7-14.)[1]  Dr. Carrillo noted that the differing levels of fentanyl found in S.R.'s two blood samples were consistent with the fentanyl acting so quickly on his body that it did not have time redistribute.  (Id. at 40:8-41:1.)  Dr. Carrillo

---

[1] As noted below, defense expert Dr. Andrew Baker also testified that the fatal level of fentanyl begins at 3 ng/mL and that 11 ng/mL is normally fatal.

further testified that photographs from the scene of S.R.'s death, depicting foil, a lighter, and straws, were consistent with his conclusion that S.R. died of fentanyl toxicity.  (Id. at 42:16-24.)

Dr. Carrillo considered that S.R. was prescribed three pharmaceuticals but determined that they did not contribute to S.R.'s death.  Of them, the only one likely to cause an overdose was bupropion, and the toxicology department would have notified Dr. Carrillo had bupropion been present in S.R.'s blood.  (Id. at 41:20-42:15.)  The other two prescription drugs S.R. was taking are extremely safe and would need to be taken in vast quantities to cause death; for instance, cetirizine, an antihistamine, would require 240 times the maximum dosage.  (Id. at 42:7-12.)  Although technically possible to overdose from them, Dr. Carrillo would expect to see evidence at the scene to support that given the dosages required, such as empty prescription bottles or pills in the victim's vomit.  (Id. at 42:20-43:16.)  None was present.  (Id. 42:20-24, 43:5-16.)

Following receipt of toxicology results, Dr. Carrillo certified S.R.'s cause of death as fentanyl toxicity or, in other words, a fentanyl overdose.  (Id. at 35:19-36:6.)  He based his conclusion on a holistic evaluation of the evidence relating to S.R.'s case, including:  the investigator's report and photograph from the crime scene, in particular the drug paraphernalia found at the scene; his external examination; the toxicology results depicting fatal levels of fentanyl in S.R.'s system and the presence of no other drugs; the lack of reported medical history or other information suggesting foul play; the fact that S.R. died at a drug rehabilitation home, which often occurs because decedents in rehabilitation homes lose their tolerance and then die when taking their former amount of drugs; and lack of evidence of a pharmaceutical overdose.  (Id. at 37:15-38:19, 39:10-17, 41:20-43:16.)

Dr. Carrillo at all times had discretion to perform an autopsy if he felt one was necessary.  (Id. at 30:25-31:4.)  In his experience, however, autopsies in cases like S.R.'s, involving decedents under 40 years of age, do not reveal natural diseases that would override his diagnoses of a drug overdose.  (Id. at 44:15-25.)  Regardless, given

7

1  the level of fentanyl in S.R.'s blood, even if Dr. Carrillo had performed an autopsy that

2  had revealed another concurrent health issue such as cancer, evidence of a heart attack or

3  aneurism, Dr. Carrillo would still classify the main cause of death as fentanyl toxicity.

4  (Id. at 46:23-47:4.)

## H. Defense Expert Dr. Andrew Baker Agrees the Level of Fentanyl in S.R.'s Blood is Ordinarily Lethal and That S.R.'s Case Is an "Easy" One

Defense expert Dr. Andrew Baker testified that he was not offering an opinion regarding S.R.'s cause of death.  Nor was it his opinion that S.R. did *not* die of a fentanyl overdose.  (6/28/24 Tr. at 151:16-23.)

Dr. Baker testified that there is a spectrum of cases involving opioid fatalities, with "easy" and "hard" cases.  (Id. at 155:21-156:7.)  "Easy" cases are those where the victim is young, there is drug paraphernalia at the scene, toxicology results are positive for fentanyl, the victim is not prescribed opiates, and there are no competing disease processes.  (Id. at 156:20-157:9.)  "Hard" cases, by contrast, involve older decedents with prescription medications found at the scene of death, with prescribed opiates in their systems and competing disease processes that would explain their deaths.  (Id. at 157:11-24.)  Dr. Baker admitted he was not aware of any facts indicating S.R.'s case was not an "easy" one.  (Id. at 159:10-160:2.)

Dr. Baker agreed that foam at the mouth, or frothy edema, is typically seen by death investigators at opioid overdose death scenes and is consistent with death by fentanyl overdose.  (Id. at 160:17-23, 161:4-9.)

Like Dr, Carrillo, Dr. Baker testified that the fatal level of fentanyl begins at 3 ng/mL.  (Id. at 168:10-14 ["Q. . . . And you have also certified fentanyl overdose deaths at a level above three nanograms per milliliter, right?  A.  Yes.  Q.  And the levels in this case are above three, right?  A.  Yes."].)  Dr. Baker agreed, consistent with his testimony in other cases, that 11 ng/mL is "a fatal level of fentanyl under normal circumstances." (Id. at 167:5-25.)

### I. Safe Refuge Records Show S.R. Had No Health Problems, Took Medications in a Controlled Manner, and Was Not Using Illicit Drugs

Kathy Romo, executive director of Safe Refuge, testified regarding relevant policies and procedures in place there.  She testified that all clients' prescription medication is kept by Safe Refuge in a central, secure location.  (6/27/24 Tr. at 216:2-8.)  When clients need to take their prescription medication, they go to the central medication building, where a staff member watches them take the medication and record it in the medication log.  (Id. at 216:9-20.)  This procedure ensures clients take the proper amount of their prescribed medication.  (Id. at 216:21-25.)  This process was followed with S.R. as to the medications he was prescribed.  (Id. at 227:9-228:6; Exs. 256-258.)

Safe Refuge residents are regularly tested for 14 different drugs, including fentanyl, on an approximately weekly basis or more often as needed.  (6/27/24 Tr. at 221:4-222:5, 225:22-226:2.)  During his time at Safe Refuge, S.R. tested positive for THC on the day of his admittance.  (Id. at 224:10-16.)  He took a total of eight drug tests between his admission on October 25, 2021, and the date of his death on December 10, 2021; none was positive for fentanyl.  (Id. at 225:2-11; Exs. 245-252.)

Safe Refuge assesses clients' medical needs upon their intake by having them fill out a health questionnaire.  (6/27/24 Tr. at 228:10-17.)  S.R. reported no current health issues.  (Id. at 230:17-21; Ex. 255.)

## III. LEGAL STANDARD

"The hurdle to overturn a jury's conviction based on a sufficiency of the evidence challenge is high."  United States v. Rocha, 598 F.3d 1144, 1153 (9th Cir. 2010).  The jury's verdict must stand if, "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  United States v. Reed, 575 F.3d 900, 923 (9th Cir. 2009) (quotations omitted; emphasis added).  The sufficiency analysis for a Rule 29 motion is two-fold.

1  "First, a reviewing court must consider the evidence presented at trial in the light

2  most favorable to the prosecution." United States v. Nevils, 598 F.3d 1158, 1164 (9th

3  Cir. 2010) (en banc) (citing Jackson v. Virginia, 443 U.S. 307, 319 (1979)).  In so doing,

4  this Court "may not usurp the role of the finder of fact by considering how it would have

5  resolved the conflicts, made the inferences, or considered the evidence at trial." Id.

6  (citing Jackson, 443 U.S. at 318-19).  Indeed, "[c]ircumstantial evidence and the

7  inferences drawn from [the evidence at trial] may be sufficient to sustain a conviction."

8  United States v. Lewis, 787 F.2d 1318, 1323 (9th Cir. 1986).  Thus, when "'faced with a

9  record of historical facts that supports conflicting inferences,' a reviewing court 'must

10  presume -- even if it does not affirmatively appear in the record -- that the trier of fact

11  resolved any such conflicts in favor of the prosecution, and must defer to that

12  resolution.'" Nevils, 598 F.3d at 1164 (citing Jackson, 443 U.S. at 326, and McDaniel v.

13  Brown, 130 S. Ct. 665, 673-74 (2010)).  "[T]he government does not need to rebut all

14  reasonable interpretations of the evidence that would establish the defendant's

15  innocence, or 'rule out every hypothesis except that of guilt beyond a reasonable

16  doubt.'" Id. at 1163–64 (quoting Jackson, 443 U.S. at 326).  Only where "mere

17  speculation, rather than reasonable inference, supports the government's case, or where

18  there is a total failure of proof of a requisite element" is the evidence legally insufficient.

19  Id. at 1167 (citations, quotations, and alterations omitted).

20  Second, because "[a] jury's verdict is not to be disturbed lightly," United States v.

21  Begay, 673 F.3d 1038, 1043 (9th Cir. 2011), and is afforded "great deference," United

22  States v. Pelisamen, 641 F.3d 399, 409 n.6 (9th Cir. 2011), "the reviewing court must

23  [next] determine whether this evidence . . . is adequate to allow 'any rational trier of fact

24  [to find] the essential elements of the crime beyond a reasonable doubt.'" Nevils, 598

25  F.3d at 1164 (quoting Jackson, 443 U.S. at 319 (emphasis and alteration in original)); see

26  also United States v. Solorio, 669 F.3d 943, 954-56 (9th Cir. 2012) (even where there

27  was a "major gap" in evidence relating to one required element and "facts could

28  certainly support an inference" that the element was unsatisfied, "the record as a whole"

and the "'great deference'" accorded jury verdicts precluded court from setting guilty

verdict aside). "At this second step, ... a reviewing court may not 'ask itself whether it

believes that the evidence at the trial established guilt beyond a reasonable doubt,' only

whether '*any*' rational trier of fact could have made that finding." Nevils, 598 F.3d at

1164 (quoting Jackson, 443 U.S. at 318-19) (emphasis in original).

## IV.    ARGUMENT

### A.    The Evidence in the Light Most Favorable to the Government Compels the Denial of Defendant's Rule 29 Motion

In support of his motion for a judgment of acquittal, defendant raises only

hypothetical doubts and ignores the vast bulk of evidence that demonstrated his guilt and

supported the jury's verdict. Defendant's arguments lack merit, rehash arguments that

were rejected by the jury, and should be rejected by this Court.

### B.    A Rational Trier of Fact Could Have Determined that Defendant Distributed Fentanyl

This Court previously denied defendant's Rule 29 motion as to distribution from

the bench, stating that "with regard to knowing distribution . . . [t]here's ample evidence

in this record from which a very reasonable jury could reach the conclusion that Mr.

Gutierrez knowingly distributed [fentanyl]." (6/28/24 Tr. at 210:8-11; see also id. at

210:14-16 ("[F]rom the standard that applies, there's no doubt in this Court's mind that

the evidence amply satisfies the Rule 29 standard."). The Court's ruling was correct, and

the Court should decline defendant's invitation to reconsider it now.

Defendant first argues that "on December 9, 2021, Feusier went over to Mr.

Gutierrez's house to be intimate with him," not to obtain fentanyl. (Mot. at 13.) Not so.

Feusier's direct testimony, as well as contemporaneous documentary evidence, establish

that she went to defendant's home to obtain fentanyl from him. In text messages with

defendant, Feusier asked if she could "pick up" from him. (Ex. 277 at 1.) Feusier

testified that this meant she was inquiring "[i]f I can get some fentanyl . . . because

probably I didn't have any." (6/27/24 Tr. at 120:20-121:3; id. at 121:14-25 [". . . Q.

11

And so when you say 'Can I pick up,' is that a separate -- are you referring to something else?  A.  Yes.  Q.  Specifically, what?  A.  Fentanyl.")  Feusier's use of the term "pick up" was consistent with her use of that term with defendant on other occasions.  (6/27/24 Tr. at 97:9-98:2, 99:10-16, 110:23-111:6, 115:5-9.)  Although the conversation briefly diverged from the topic of fentanyl when Feusier told defendant she would <u>not</u> "bother" him about being intimate, Feusier quickly returned the conversation to fentanyl, again asking: "But can I pick up [?]."  (6/27/24 Tr. at 121:11-25.; Ex. 277 at 2.)  Feusier unequivocally testified that once at his home, defendant distributed fentanyl to her by breaking off a piece of fentanyl for her, and gave her baggies, one of which she used to package the fentanyl that she then delivered to S.R.  <u>See</u> Section II(B), *supra*.

Simultaneous with Feusier's conversation with defendant, she was messaging with S.R. about obtaining fentanyl for him from defendant.  She told S.R. she was "at the connects waiting for him to come out . . . I'll send you a pic of your sac [of fentanyl] when he weighs it."  (Ex. 114 at 9.)  She then sent S.R. a screenshot of her text message conversation with defendant – whom she described as her "connect" – in which defendant told Feusier he was "on. [sic] My way home right now . . . . Il [sic] be there by 630."  (<u>Id.</u> at 14.)  Accordingly, contrary to defendant's assertion, Feusier directly testified, and contemporaneous evidence corroborates, that Feusier went to defendant's home to obtain fentanyl, and that she did in fact obtain fentanyl from him, which she distributed to S.R.  There was more than sufficient evidence for a rational jury to conclude that defendant knowingly distributed fentanyl to her.

Defendant argues Feusier's "story regarding how she allegedly obtained fentanyl from Mr. Gutierrez was not credible."  (Mot. at 14.)  But "it is the <u>exclusive</u> function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts."  <u>United States v. Dreitzler</u>, 577 F.2d 539, 545 (9th Cir. 1978) (emphasis added; cleaned up).  Feusier's testimony regarding defendant's knowing distribution of fentanyl to her was clear and unequivocal, and supported by

contemporaneous text messages.  Feusier's credibility was for the jury to decide, and the jury did so in finding defendant guilty of distribution.

Defendant claims a "complete lack of corroboration" for Feusier's account of events after her arrival at defendant's home on December 9, 2021, in particular, her testimony that defendant had to obtain fentanyl from his own supplier.  But no corroboration is required for the jury to have credited Feusier's direct, firsthand account of events.  Even so, defendant is flatly wrong because there was significant corroboration before the jury supporting her accounting of events.  In text messages with Feusier, S.R. became frustrated and anxious because Feusier was unresponsive for hours.  (Ex. 114 at 22-23 ["Seems like I got bailed on.  U said he got there like over an HR ago n u haven't even told me anything. . . . .  I feel let down . . .  This is sad as fuck jay."].)  Feusier ultimately responded and explained the reason for the delay:  "Ok so we ran into a problem but it's fixe[d] now. . . .  [defendant] basically had to go back for more because he gave him the wrong stuff."  (Ex. 114 at 24-25.)  Feusier understandably did not identify defendant's supplier by name, but she plainly told S.R. in real time exactly what she testified to on the witness stand – that after arriving at defendant's home, defendant had to obtain fentanyl from <u>his</u> source before he had any to distribute to her.  This is consistent with the four-hour gap, reflected in Uber records, between when Feusier arrived at defendant's home and when she sent the fentanyl to S.R. from there.  (Ex. 111.)

Nor, contrary to defendant's assertion, did Feusier invent the supplier on the witness stand.  Although Feusier testified that defendant had to get fentanyl from his supplier that evening, she did <u>not</u> testify with certainty that the supplier in question was Matt in Hollywood, rather, she stated she was "pretty sure" that defendant's supplier "was Matt at the time."  (6/27/24 Tr. at 137:11-16.)  This, too, was corroborated:  The jury had before it text messages between defendant and Feusier identifying the same

1  individual as defendant's fentanyl supplier earlier in 2021.[2]  (Ex. 270 at 16-17; 6/27/24

2  Tr. at 98:17-99:6 [identifying Matt as a fentanyl supplier to defendant].)  While Feusier's

3  compelling, first-hand account of events did not require corroboration for the jury to

4  credit it, it was, in fact, corroborated.

5      Accordingly, as this Court has already concluded, there is more than sufficient

6  evidence for a rational trier of fact to have concluded that Gutierrez distributed fentanyl

7  to Feusier.  Defendant's motion should be denied once again as to distribution.

8  **C.    A Rational Trier of Fact Could Have Determined that the Fentanyl**

9  **Distributed by Defendant Caused S.R.' S Death**

10     After the close of evidence, the Court stated that it was "satisfied, at least at this

11  point, that there is sufficient evidence from which a reasonable jury could conclude that

12  there was indeed pulmonary injury.  There is circumstantial evidence that would suggest

13  that the pulmonary injury was a result of a fentanyl overdose.  While that is disputed and

14  highly attacked, I'm inclined to believe that it's a jury determination, and not something

15  that the Court can remove or should remove from the jury at this point."  (7/1/24 Tr.,

16  Dkt. 244, at 5:12-19.)  The Court's ruling was correct at the time, and the jury's verdict

17  that the fentanyl distributed by defendant caused S.R.'s death is amply supported by the

18  evidence and easily satisfies the standard that applies at this stage, i.e. that a rational jury

19  could find defendant's distribution of fentanyl caused victim S.R.'s death.

20     All of the concrete, <u>non-speculative</u> evidence before the jury indicated that S.R.

21  died as a result of a fentanyl overdose.  That evidence showed that S.R. died:  in a drug

22  rehabilitation home, where his tolerance had plummeted as a result of not using fentanyl

23  and where overdose deaths are therefore not uncommon; with foam at his mouth as

24  reported by Reveles, which is a telltale sign of pulmonary edema triggered by a fentanyl

25  overdose; surrounded by a baggie of fentanyl identical to the one Feusier sent him, as

26  _____

27      [2]  Additionally, the government disclosed to defendant in April 2024 a report from
a proffer that month in which Feusier identified "Matt . . . who lived in Hollywood" as

28  "Gutierrez's source for fentanyl" as of October 2021.

well as a lighter, foil and straws for smoking fentanyl, with the foil and one of the straws later testing positive for the presence of fentanyl; within *hours* of receiving the fentanyl from Feusier, after paying Feusier $60 to deliver him fentanyl that she sent from defendant's home; after retrieving the fentanyl from the Uber at 11 PM and bringing it back inside Safe Refuge, as was captured on surveillance video and reflected in Uber records; with a fatal level of fentanyl in his system, a fact testified to by both sides' experts; with differing fentanyl concentrations in his jugular vein and femoral artery, which Drs. Javed and Carrillo both stated is consistent with rapid death brought on by fentanyl; with no other drugs of abuse in his system; with no significant medical problems reported as of late 2021; with no signs of trauma or foul play; with no indicia of suicide or accidental pharmaceutical overdose; and with no outward signs of any other health problem.  (See Sections II(B)-(I), supra.)  Dr. Carrillo testified at length about the reasons he concluded, based upon his holistic review of the case, that S.R. died of fentanyl toxicity and not some other cause.  Further, all three experts who testified at trial regarding causation – Dr. Carrillo, Dr. Javed, and defendant's expert, Dr. Baker – testified that the level of fentanyl in S.R.'s blood was within the lethal range.  On this factual record, with substantial evidence that S.R. overdosed on the fentanyl delivered to him just hours before his death and with no evidence whatsoever of any other possible cause of death or underlying medical problem, a rational trier of fact could have found that fentanyl was the but-for cause of S.R.'s death.[3]

In the instant motion, as at trial, defendant argues the government did not meet its burden because LACME did not conduct an autopsy of S.R.'s body.  As a matter of law,

---

[3] A rational jury could also have rejected defendant's speculative argument that S.R.'s reported fentanyl concentrations are of "limited value . . . due to the phenomenon of post-mortem redistribution" (Mot. at 1), given that both Dr. Javed and Dr. Carrillo testified that the difference in concentrations between the two samples was consistent with the fentanyl having killed S.R. so quickly that his body did not have time to evenly distribute it (see Sections II(F)-(G), supra), and in light of the total lack of evidence for any other cause of death.

defendant's argument is without basis.  In <u>United States v. Davis</u>, a coroner opined that fentanyl was the but-for cause of death based on the fentanyl found in the victim's blood. 970 F.3d 650 (6th Cir. 2020).  In that case, as here, the coroner had not performed an autopsy but testified that based on case-specific indicators including toxicology results and the victim's age and good health, no autopsy was needed to determine the victim had died of a fentanyl overdose.  <u>Id.</u> at 661.  The jury found the defendant guilty of distribution and found true the death-resulting enhancement.  On appeal, the Sixth Circuit rejected defendant's challenge to the sufficiency of the evidence supporting the death-resulting enhancement, stating that "the enhancement requires nothing more" than the coroner's testimony.  <u>Id.</u> at 658.  The Sixth Circuit rejected the defendant's contention that the coroner's testimony should have been barred, stating that it was aware of "no case from our court (or others) holding that an autopsy is always a required 'diagnostic technique' before an expert may opine on a cause of death," and that while the lack of autopsy "may have affected the weight the jury should give [the coroner's] opinion," it was properly admitted at trial.  <u>Id.</u> at 661.  As in <u>Davis</u>, Dr. Carrillo was entitled to give his reasoned opinion as a seasoned forensic pathologist regarding S.R.'s cause of death, including why he felt an autopsy was unnecessary, and the jury was entitled to credit it, along with all of the <u>other</u> evidence in the record showing S.R. died of a fentanyl overdose.

Defendant's argument fares no better on the facts.  He recycles in his motion the same factual arguments that were articulated at length at trial by Dr. Baker and that the jury considered and rejected.  Defendant points to an Alabama study discussed by Dr. Baker purporting to find a 25% error rate in "suspected drug-related deaths without an autopsy where scene investigation or medical history indicated evidence of drug use." But that study was generic to all drugs and not specific to fentanyl – which the jury heard is uniquely powerful and dangerous – and did not account for the myriad pieces of evidence in the record showing that fentanyl, and nothing else, caused S.R.'s death.  Its purported 25% error rate sheds no light whatsoever on the accuracy of Dr. Carrillo's

conclusion here, nor does it establish that his conclusion was speculative.  Defendant also points to a study of fentanyl levels in certain drivers discussed by Dr. Baker, but on cross-examination, Dr. Baker disclaimed any knowledge of whether the subjects were naïve users (or of anything else about the subjects), without which the study had no relevance to S.R.'s case, given the evidence in the record that as of December 9, 2021, S.R. was a naïve user and that naïve users have drastically lower tolerance than experienced ones.  (6/28/24 Tr. at 165:3-166:11.)[4]  Finally, for the reasons stated in the United States' closing argument, Dr. Baker was simply not a credible witness:  His testimony on cross-examination was alternatively hostile and evasive, in stark contrast to his demeanor on direct examination; he had done little work to understand the facts of the case or common overdose death investigation practices in our region; and he unconvincingly sought to explain away past statements that supported the government's contention that S.R. died of a fentanyl overdose.  (See Closing Argument, 7/1/24 Tr. at 48:16-55:11.)  The jury was entitled to disregard his testimony for that independent reason.

Defendant finally asserts the Court should acquit based on the Seventh Circuit's decision in Krieger v. United States, 842 F.3d 490 (7th Cir. 2016).  But Krieger is not a Rule 29 case, or even a case in which a jury found that a defendant's distribution of fentanyl caused death.  Rather, the defendant in Krieger pleaded guilty to simple distribution of fentanyl.  Id. at 493.  The defendant sought post-conviction collateral relief from the district court's determination, by the preponderance of evidence at sentencing, that the defendant's distribution of fentanyl had resulted in death.  The Seventh Circuit held that Burrage – the Supreme Court's decision defining "but for" causation under 21 U.S.C. § 841(b)(1)(c) and handed down after defendant's conviction

---

[4] Moreover, the jury was entitled to disregard the study given the reported average fentanyl concentration of drivers in it – 9.6 ng/mL – was far below the concentration found in S.R.'s jugular vein (14 ng/mL), more than three times above the level at which both Dr. Carrillo *and* Dr. Baker testified fentanyl fatalities begin (3 ng/mL), and just shy of the concentration (11 ng/mL) which Dr. Baker agreed is "usually fatal."

1   – announced a substantive change in law that applied retroactively on collateral review

2   and therefore remanded the case to the district court to consider causation again on a

3   "clean slate" under <u>Burrage</u>'s standard.  <u>Id.</u> at 504-05.  Here, by contrast, there <u>was</u> a

4   jury trial, the jury <u>was</u> properly instructed on the correct legal standard, and the jury

5   unanimously found death resulted from defendant's distribution under that legal

6   standard.  <u>Krieger</u> has no application whatsoever to this case, where the question for the

7   Court is whether a rational trier of fact could have concluded that fentanyl was the "but

8   for" cause of S.R.'s death based on all of the evidence in this case.

9          Procedural inapplicability aside, defendant's attempt to analogize this case to

10  <u>Krieger</u> fails.  Defendant argues that as in <u>Krieger</u>, the "government's analysis focused

11  on the concentration of fentanyl in the decedent's blood to the exclusion of other

12  possible causes of death."  The evidentiary record flatly refutes that.  All three experts,

13  for both sides, testified that the concentration of fentanyl in S.R.'s blood was within the

14  range at which fentanyl toxicity occurs.  Dr. Carrillo testified about the reasons that he

15  considered and rejected other possible causes of death, including pharmaceutical

16  overdose, trauma, and concurrent health problems, in arriving at his conclusion.  The

17  jury had before it myriad other evidence in addition Dr. Carrillo's testimony

18  demonstrating that S.R. overdosed on fentanyl.  Moreover, there was substantial

19  evidence in the record – including Safe Refuge medical records, drug testing records,

20  and prescription drug dispensary records for S.R. – refuting defendant's hypothesis that

21  S.R. died from some other unspecified health condition, from overdosing on prescribed

22  pharmaceuticals, or from using other illicit drugs while at Safe Refuge.  (<u>See</u> Section

23  II(I), <u>supra</u>.)  It is pure speculation to suggest an autopsy would have revealed some

24  <u>other</u> cause of S.R.'s death, in the absence of any evidence in the record whatsoever to

25  support that contention.  On this evidentiary record, a rational jury could easily have

26  concluded that any doubts raised by defendant about S.R.'s cause of death were

27  speculative and hypothetical doubts, not reasonable ones.

28                                  *       *       *

                                        18

1   The Court's role at this stage is not to "ask itself whether it believes that the
2   evidence at the trial established guilt beyond a reasonable doubt,' only whether 'any'
3   rational trier of fact could have made that finding." Nevils, 598 F.3d at 1164.  On the
4   basis of all of the evidence before it, the jury could have rationally concluded that S.R.
5   died from the only possible cause for which there was any evidence in the record, that is,
6   fentanyl toxicity.

7       **D.    A Rational Trier of Fact Could Have Determined that the Fentanyl**
8               **Distributed by Defendant Caused S.R.' S Serious Bodily Injury**

9   Because a rational trier of fact could have found that the fentanyl distributed by
10  defendant caused S.R.'s death, so, too, could a rational trier of fact have concluded that
11  the fentanyl distributed by defendant also caused S.R.'s serious bodily injury.

12  Even assuming arguendo, however, that the jury were to have credited defendant's
13  wholly unsupported theory that S.R. was undergoing a fatal medical event at the exact
14  moment he had obtained and ingested the fentanyl Feusier sent, a rational jury still could
15  have determined that he suffered serious bodily injury.  Dr. Javed testified regarding the
16  effects of fentanyl on the human body, and how where a victim has consumed excess
17  fentanyl, their pulmonary system will shut down, leading their lungs to fill with
18  pulmonary fluid and causing them to drown in their own lung fluid.  (See Section II(F),
19  supra.)  Dr. Javed noted that in such cases, victims often display a telltale foam on their
20  noses and mouths, the result of pulmonary fluid hitting the air.  (Id.)  Vanessa Reveles
21  testified that S.R. had that telltale foam on his mouth when she arrived at his body to
22  perform CPR.  (See Section II(C), supra.)  Dr. Javed testified that photographs of S.R.'s
23  body taken at the death scene were consistent with that process, pulmonary edema,
24  having occurred.  (See Section II(F), supra.)

25  "Serious bodily injury" means bodily injury which involves, in relevant part, a
26  "substantial risk of death" or a "protracted loss or impairment of the function of a bodily
27  member, organ, or mental faculty."  21 U.S.C. § 802(25).  Based on all of the evidence
28  before it, a rational jury could have concluded that S.R. suffered pulmonary edema as a

result of consuming fentanyl distributed by defendant, and that the pulmonary edema posed a substantial risk of death to him and/or caused a protracted loss or impairment of the functions of his lungs.[5]   Accordingly, a rational trier of fact could have concluded that S.R. suffered serious bodily injury as a result of consuming fentanyl defendant distributed.

## V.    CONCLUSION

For the foregoing reasons, the Court should deny defendant's motion for a judgment of acquittal in its entirety.

Dated: January 7, 2025                Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

LINDSEY GREER DOTSON
Assistant United States Attorney
Chief, Criminal Division


        /s/
JEREMY K. BEECHER
DANBEE C. KIM
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

---

[5] This constitutes a distinct injury to S.R. from his death, thereby distinguishing the cases defendant cites in which certain courts, interpreting other statutes, have held that death, by itself, does not is not a serious bodily injury.

20

## **<u>CERTIFICATE OF COMPLIANCE WITH C.D. CAL. R. 11-6.2</u>**

The undersigned, counsel of record for the United States of America, certifies that this brief contains 6,941 words, which complies with the 7,000 word limit set by the Court's Criminal Standing Order (Updated 3/1/24).

Dated: January 7, 2025             Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

LINDSEY GREER DOTSON
Assistant United States Attorney
Chief, Criminal Division


            /s/
JEREMY K. BEECHER
DANBEE C. KIM
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

21