UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>JUAN CARLOS GUTIERREZ,<br><br>    Defendant. | Case No. 2:23-cr-00197-SB-1<br><br>ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL AND MOTION FOR NEW TRIAL [DKT. NOS. 269, 270] |

In July 2024, a jury convicted Defendant Juan Carlos Gutierrez of distribution of fentanyl resulting in serious bodily injury and death. Gutierrez now moves for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure, arguing that there was insufficient evidence that Gutierrez knowingly distributed fentanyl that caused death or serious bodily injury. In the alternative, Gutierrez moves for a new trial under Rule 33, raising various arguments about the validity of the jury's verdict and the government's conduct at trial. Because Gutierrez has not identified a valid reason to disturb the jury's verdict, the motions are denied.

I.

Gutierrez was charged with distribution of fentanyl resulting in death and serious bodily injury under 21 U.S.C. § 841(a)(1) and (b)(1)(C). Dkt. No. 27. Under § 841(b)(1)(C), a criminal defendant is subject to a 20-year mandatory minimum sentence if he unlawfully distributed fentanyl and "death or serious bodily injury result[ed] from the use of such substance." Gutierrez proceeded to trial in June 2024 on both the distribution charge and the sentencing enhancement. Jayleen Feusier, Gutierrez's co-defendant, entered into a plea agreement and testified against Gutierrez.

At trial, the government presented evidence of the following facts. On December 9, 2021, Feusier received a message from her friend, S.R., who asked if she could supply him with fentanyl in exchange for $60. Tr. Ex. 114 at 3, 6–9. Feusier responded that she could get fentanyl for him, and later that day, she went to Gutierrez's home to pick up the fentanyl. Feusier and Gutierrez went to a supplier, who gave Gutierrez the fentanyl. Dkt. No. 243 at 137. After returning home, Gutierrez broke off a piece of fentanyl for Feusier, who then broke off a piece for S.R. *Id.* at 138. She placed a baggie of the fentanyl, a lighter, and foil in a bag for S.R., along with a T-shirt to conceal the fentanyl. *Id.* at 140. From Gutierrez's house, Feusier sent the bag in an Uber Connect to Safe Refuge, the drug rehabilitation facility where S.R. was living. *Id.* S.R. sent Feusier a message confirming that he received the package from the Uber Connect. Tr. Ex. 114 at 31. The next morning, S.R. was found dead at Safe Refuge, surrounded by the drug paraphernalia that Feusier had sent and her T-shirt. Dkt. No. 237 at 45, 48–49; Tr. Ex. 209. After conducting an external examination of S.R.'s body, testing his blood, and reviewing the case record, the Los Angeles County Department of Medical Examiner (LACME) concluded that he died from fentanyl toxicity. Dkt. No. 243 at 29–47.

The defense contested whether Gutierrez knowingly distributed the fentanyl to Feusier and whether fentanyl caused S.R.'s death or serious bodily injury. In particular, the defense focused on the fact that the medical examiner did not conduct an autopsy, eliciting evidence that the cause of S.R.'s cause of death could not have been reliably determined without it. *See, e.g.*, Dkt. No. 267 at 98–101, 150–151. The defense also attacked Feusier's credibility, questioning her about her agreements with the government. Dkt. No. 243 at 177–82.

The parties presented closing arguments on July 1, 2024, after which the jury began its deliberations. On July 3, the Court received a note stating that a juror was basing his reasoning on Gutierrez's lack of testimony. Dkt. No. 209. After a colloquy with the juror in question, the Court—at Gutierrez's urging and over the government's objection—dismissed the juror and seated an alternate (to whom Gutierrez objected) in his place. Less than 12 minutes later, the jury returned its verdict, finding beyond a reasonable doubt that: (1) Gutierrez was guilty of distributing fentanyl; (2) the fentanyl distributed by Gutierrez resulted in serious bodily injury to S.R.; and (3) the fentanyl distributed by Gutierrez resulted in S.R.'s death. Dkt. No. 214.

After the close of the government's case, Gutierrez moved for a judgment of acquittal under Rule 29, arguing that there was insufficient evidence to prove

knowing distribution or to meet the sentencing enhancement requirements.  Dkt.
267 at 46–47.  The Court denied the motion with respect to knowing distribution
but reserved judgment on whether the government presented sufficient evidence on
death and serious bodily injury.  *Id.* at 221.  When the jury returned its verdict, the
defense renewed its motion, and the Court ordered the parties to brief the matter.
Dkt. No. 248 at 45–46.  Gutierrez now moves for a judgment of acquittal under
Rule 29 or, in the alternative, a new trial under Rule 33.  Dkt. Nos. 269, 270.

## II.

The Court first addresses Defendant's Rule 29 motion for a judgment of
acquittal based on insufficient evidence.  "The hurdle to overturn a jury's
conviction based on a sufficiency of the evidence challenge is high."  *United States
v. Rocha*, 598 F.3d 1144, 1153 (9th Cir. 2010).  Under Rule 29, a district court
must set aside a verdict and enter an acquittal if, viewing the evidence in the light
most favorable to the government, no rational juror could have found the essential
elements of the crime beyond a reasonable doubt.  *United States v. Niebla-Torres*,
847 F.3d 1049, 1054 (9th Cir. 2017).  Conflicting evidence must be resolved in
favor of the jury verdict, and all reasonable inferences must be drawn in favor of
the government.  *United States v. Corona-Verbera*, 509 F.3d 1105, 1117 (9th Cir.
2007).  In assessing a Rule 29 motion, the court "cannot second-guess the jury's
credibility assessments."  *United States v. Nevils*, 598 F.3d 1158, 1170 (9th Cir.
2010).

Gutierrez argues that there was insufficient evidence to prove beyond a
reasonable doubt that: (1) he knowingly distributed fentanyl, (2) fentanyl caused
S.R.'s death, or (3) fentanyl caused serious bodily injury to S.R.

## A.

To render a guilty verdict, the jury was required to find beyond a reasonable
doubt that Gutierrez knowingly distributed fentanyl.  21 U.S.C. § 841(a)(1).  At
trial, the government's theory was that Gutierrez knowingly gave fentanyl to
Feusier, who later distributed it to S.R.  The government was not required to
demonstrate that Feusier's distribution to S.R. or S.R.'s death was foreseeable to
Gutierrez.  *United States v. Houston*, 406 F.3d 1121, 1122–23 (9th Cir. 2005).

To prove knowing distribution, the government relied on Feusier's
testimony and corroborating documentary evidence.  Feusier testified that she had
known Gutierrez for over a decade and that he had sold her fentanyl "about every

3

other day" over the course of seven years. Dkt. No. 243 at 88, 90. The government introduced a series of text messages between Feusier and Gutierrez from December 8 and 9, 2021, wherein Feusier asked if she could "pick up" from him—language she had used in her previous dealings with Gutierrez. Tr. Ex. 277 at 1–2; Tr. Ex. 270 at 15–18; Tr. Ex. 276 at 6. Feusier confirmed at trial that on December 8 and 9, she was asking Gutierrez if she could pick up fentanyl. Dkt. No. 243 at 120–21. Feusier then testified about the series of events that followed. After she arrived at Gutierrez's house, the two of them went to pick up fentanyl from a supplier. *Id.* at 137. Feusier testified that she was "pretty sure" they went to pick up from someone named Matt in West Hollywood. *Id.* They then returned to Gutierrez's house, and Gutierrez broke off a piece of fentanyl for Feusier. *Id.* at 138. Gutierrez gave her two baggies to package the fentanyl. *Id.* Feusier broke off about a gram of the fentanyl, which she sent to S.R. in a baggie, along with a T-shirt, a lighter, and foil. *Id.* at 139–43.

The government also introduced evidence that Feusier was concurrently messaging S.R., who asked on December 9 if she could "hook [him] up" with some fentanyl. Tr. Ex. 114 at 2; Dkt. No. 243 at 128–29. Throughout the night, Feusier and S.R. continued to message each other. Feusier told S.R. that she was "at the connects" (which she explained at trial meant Gutierrez's house), that they had to pick up the fentanyl, and that she was sending him the fentanyl and other items in an Uber Connect. Tr. Ex. 114 at 9, 24; Dkt. No. 243 at 132, 137, 139–40. S.R. then confirmed that he had received the fentanyl and Feusier's shirt. Tr. Ex. 114 at 31 ("Thank you!!!! Aw, your little shirt."). Viewed in the light most favorable to the government, Feusier's testimony and the corroborating documentary evidence were sufficient to permit a rational jury to conclude beyond a reasonable doubt that Gutierrez knowingly provided fentanyl to Feusier.

Gutierrez argues that Rule 29 relief is warranted because other evidence suggested otherwise. For example, the defense points to the evidence that Feusier received $60 from S.R. for the fentanyl but did not give any of that money to Gutierrez. Dkt. No. 243 at 185. Gutierrez also points to evidence that he was not at the house when Feusier sent the fentanyl to S.R. *Id.* at 183. Gutierrez then highlights other parts of his text chain with Feusier to argue that her reason for coming to his house was to be intimate, not to pick up fentanyl. *See* Tr. Ex. 277 at 3–4. In the face of the substantial evidence of knowing distribution recited above, however, the Court does not find Gutierrez's arguments sufficient to overturn the jury's verdict. The defense made these same arguments at trial, and the jury was free to reject them in light of the government's evidence.

Gutierrez also argues that judgment of acquittal is warranted because
Feusier's testimony was not credible.  According to the defense, Feusier had not
previously claimed, as she did on the witness stand, that she and Gutierrez went to
pick up fentanyl from Matt.  Dkt. No. 269 at 14.  However, Gutierrez cross-
examined Feusier about her version of the facts and argued in closing that her story
was "all made up."  Dkt. No. 244 at 68.  The jury was free nevertheless to credit
her testimony, and the Court "cannot second-guess the jury's credibility
assessments" when evaluating a Rule 29 motion.  *Nevils*, 598 F.3d at 1170.

In sum, a rational juror could have found beyond a reasonable doubt that
Gutierrez knowingly distributed fentanyl to Feusier. [1]

## B.

Gutierrez next argues that there was insufficient evidence that fentanyl
caused death or serious bodily injury to S.R.  To obtain a verdict on the
§ 841(b)(1)(C) sentencing enhancement, the government needed to prove beyond a
reasonable doubt that the fentanyl distributed by Gutierrez was the but-for cause of
S.R.'s death or serious bodily injury.  *Burrage v. United States*, 571 U.S. 204, 218–
19 (2014).  At trial, the government proceeded on the theory that it could meet its
burden by proving that the fentanyl caused either death *or* serious bodily injury.
The Court instructed the jury separately on both, Dkt. No. 213 at 9–10, and the jury
was required to make two separate findings, Dkt. No. 214.  Ultimately, the jury
concluded that the government had met its burden as to both death and serious
bodily injury.  *Id.*

Gutierrez argues that there was insufficient evidence for a rational juror to
conclude that fentanyl caused S.R.'s death because no autopsy was performed on
S.R.'s body.  Because certain medical conditions can only be discerned by autopsy,
Gutierrez argues, the forensic pathologist who examined S.R.'s body could not

---

[1] Gutierrez disputes whether he knowingly provided the fentanyl to Feusier.  Dkt.
No. 244 at 80 (arguing in closing that "[t]here is strong circumstantial evidence
that Ms. Feusier may have even taken drugs from Mr. Gutierrez's residence
without his knowledge").  However, he does not appear to challenge the
sufficiency of the evidence linking the fentanyl Feusier obtained from him to the
fentanyl S.R. received.  In any event, such a challenge would fail given the
evidence cited above.

have reliably determined the cause of his death, and it was mere speculation for the
jury to attribute his death to fentanyl.

In support of his argument, Gutierrez points to evidence from his expert
witness, Dr. Andrew Baker. Dr. Baker, a forensic pathologist, testified about
standards promulgated by the National Association of Medical Examiners that
require an autopsy in all drug-related deaths. Dkt. No. 267 at 91–92. Through Dr.
Baker, the defense also introduced a study published by the American Journal of
Forensic Medicine and Pathology, which concluded that in suspected drug-related
deaths, pathologists were only able to correctly determine cause of death in 75
percent of cases without an autopsy. *Id.* at 97–101. The study concluded that
without an autopsy, determining the cause of death in suspected drug-related cases
would be "like flipping a weighted coin." *Id.* at 101. In light of this evidence,
Gutierrez argues, the government "cannot possibly" have met its burden to prove
causation beyond a reasonable doubt. Dkt. No. 269 at 6.

The government, however, introduced substantial evidence from which a
rational juror could have concluded that fentanyl was the cause of S.R.'s death—
even without an autopsy. On December 10, 2021, S.R.'s body was found next to
foil, tubes, and a lighter, as well as the shirt Feusier had sent with the fentanyl.
Dkt. No. 237 at 45, 48–49; Tr. Ex. 209. The day following S.R.'s death, his blood
contained 14 nanograms per milliliter of fentanyl in his jugular vein and 5.4
nanograms per milliliter in his femoral artery. Dkt. No. 142 at 2 (trial stipulations).
No other substances screened for by LACME—alcohol/ethanol, benzodiazepines,
cocaine and metabolites, methamphetamine, MDMA, codeine, morphine, opiates,
hydrocodone, hydromorphone, or phencyclidine—were found in his blood. *Id.*
And all three forensic pathologists, including Gutierrez's expert, testified that the
level of fentanyl in S.R.'s blood was in the lethal range. Dkt. No. 267 at 121; Dkt.
No. 243 at 36; Dkt. No. 241 at 197.[2]

---

[2] Gutierrez argues that the level of fentanyl in S.R.'s blood was not necessarily
lethal, pointing to evidence that living individuals can have higher concentrations
of fentanyl in their blood and noting the discrepancy between the fentanyl levels
found in S.R.'s jugular vein and femoral artery. *See* Dkt. No. 269 at 7–8.
However, the government introduced evidence that S.R. was living at a
rehabilitation facility at the time and that individuals can lose their tolerance to a
drug if they stop using it, placing them at a higher risk of overdose. Dkt. No. 243
at 38–39; Dkt. No. 241 at 193–94, 198. The government also presented evidence
that the two different levels of fentanyl in S.R.'s body were consistent with rapid
death—that the drug had a "quick adverse effect" before there was full distribution

Dr. Miguel Carrillo, the medical examiner who examined S.R.'s body, also testified extensively about his conclusion that S.R. had died from fentanyl toxicity. Though Dr. Carrillo did not perform an autopsy, he ruled out other potential causes of death, examining S.R.'s body for signs of foul play, injury, or disease. Dkt. No. 243 at 31, 44. He also ruled out pharmaceutical overdose, explaining that one of S.R.'s prescription medications would have been identified in the blood screen and that the other two prescriptions would have only been lethal if taken in enormous quantities, for which there was no evidence. *Id.* at 41–43. While Dr. Carrillo acknowledged the hypothetical possibility that an autopsy could have revealed something else in S.R.'s body, *id.* at 46, he determined from a holistic review that fentanyl was the cause of death. Dr. Carrillo's external examination, the levels of fentanyl in S.R.'s blood, S.R.'s age, the lack of signs of any other medical condition, and the evidence of drug paraphernalia at the scene all supported a conclusion that fentanyl was the cause of death.

The government also presented evidence about the effects of fentanyl on the body. Dr. Rakhshanda Javed, chief of the LACME Forensic Science Laboratories Division, explained that fentanyl toxicity results in pulmonary edema—a process in which respiration slows and the lungs fill with liquid, essentially causing drowning. Dkt. No. 241 at 188. When that liquid reaches the air, Dr. Javed explained, there is foaming around the nose and mouth. *Id.* Vanessa Reveles, an employee at Safe Refuge, testified that she found S.R. with "foam all over his mouth," which she wiped off before performing CPR. Dkt. No. 237 at 24, 26–27. Dr. Javed also testified that the photographs of S.R.'s body were consistent with pulmonary edema. Dkt. No. 241 at 199.

Moreover, Gutierrez has not pointed to convincing legal authority that autopsy evidence was *required* for the government to meet its burden. Gutierrez cites to *Krieger v. United States*, 842 F.3d 490 (7th Cir. 2016), in which the Seventh Circuit vacated a defendant's sentence and remanded to the district court to consider whether fentanyl was the but-for cause of her friend's death under the recently-announced test in *Burrage*. In *Krieger*, however, the medical examiners "focused only on the fentanyl to the exclusion of the other drugs in [the victim's] system," and the trial court had not determined that fentanyl was a but-for cause of

---

of the drug in the body. Dkt. No. 241 at 196–97. Such evidence was sufficient for a rational juror to infer that S.R.'s fentanyl tolerance had diminished and that the level found in his blood was lethal.

death.  *Id.* at 505.  In contrast, Dr. Carrillo testified that he had ruled out other substances and causes of S.R.'s death.  Dkt. No. 243 at 31, 41–44.  *Krieger* does not stand for the proposition that an autopsy is necessary for the government to prove causation.  *See also United States v. Spayd*, No. 3:19-CR-00111, 2023 WL 2890715, at *6 (D. Alaska Apr. 11, 2023) (rejecting argument that lack of autopsy precluded government from establishing causation beyond a reasonable doubt as "inappropriate for resolution on a Rule 29 motion"); *accord United States v. Wyche*, No. 18-CR-561, 2023 WL 6890112, at *8 (E.D.N.Y. Oct. 19, 2023).

    In sum, the government introduced significant evidence from which a rational jury could have found beyond a reasonable doubt that fentanyl toxicity was the but-for cause of S.R.'s death, and there was no evidence to the contrary.[3] The motion is denied.

III.

    The Court next turns to Gutierrez's motion for a new trial under Rule 33, which provides that the "court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  A motion for a new trial "should be granted only in exceptional cases in which the evidence preponderates heavily against the verdict."  *United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981) (cleaned up).  Gutierrez moves for a new trial on three grounds, arguing that: (1) he was deprived of his Fifth Amendment right to due process and Sixth Amendment right to a unanimous verdict by an impartial jury; (2) the government engaged in misconduct during its rebuttal argument; and (3) the Court erred in limiting the defense's ability to cross-examine Feusier about Gutierrez's knowledge of S.R.

A.

    Gutierrez argues that he was deprived of his Fifth and Sixth Amendment rights because the Court improperly dismissed a juror and then improperly seated an alternate juror who expressed apprehension about her ability to serve, after which the jury failed to restart their deliberations as instructed.  The Court addresses each argument in turn.

---

[3] Because the government could have met its burden under § 841(b)(1)(C) by proving that fentanyl caused either death *or* serious bodily injury, the Court need not separately determine whether it met its burden as to serious bodily injury.

1.

The jury received the case for deliberations on July 1, 2024, at 2:11 p.m., and deliberated through the following day.  On July 3, 2024, the jury submitted a note to the Court, stating:  "We have a Juror who is basing his reasoning on [whether] the defendant testified or not."  Dkt. No. 209.  During voir dire, the Court had explained to the jury that Gutierrez may not testify and that it could not consider his silence in its deliberations.  Dkt. No. 254 at 47–48.  The Court reiterated in in its final instructions that Gutierrez had a constitutional right not to testify, that the jury could not "draw any inference . . . from the fact that the defendant did not testify," and that the law prohibited the jury from "considering in any manner that the defendant did not testify."  Dkt. No. 213 at 2–3.

After receiving the jury note, the Court heard from the parties.  The defense took the position that the juror should be excused based on his "pretty egregious nonadherence to the Court's instructions."  Dkt. No. 248 at 3.  The Court then questioned the foreperson, who explained that Juror 3 "made a comment that because the . . . defendant didn't testify, he couldn't make a decision—or that affected his ability to make a decision."  *Id.* at 11.  The foreperson added that Juror 3 "also made some comments about his responsibilities for following jury instructions" and "indicated that he is not required to follow the jury instructions."  *Id.* at 13.

The Court then separately questioned Juror 3, who confirmed that he had raised the issue of Gutierrez's decision not to testify.  *Id*. at 18.  The Court asked him whether he had heard the instruction that jurors could not take into account Gutierrez's decision not to testify.  Juror 3 responded that he "remember[ed] some" but was "not clear exactly what [the Court] said," that he "probably didn't catch it," and that he guessed he "didn't understand every word [the Court] said about that."  *Id.* at 19.  The Court then asked Juror 3 if he understood the gist or substance of the instruction, to which Juror 3 responded: "Well, clearly no.  I'm not a lawyer, so I – so I don't know."  *Id.* at 20.  The following exchange ensued:

The Court:  So if I instruct you and tell you that you can't take that into account at all, that it's highly improper, are you able to follow my instruction and not take that into account?

. . .

Juror 3:  Now that you've explained it to me, Your Honor, I fully understand.

The Court:  Well, but more than fully understand, can you honestly tell me that you will not take that into account in your deliberations? Meaning it won't affect you at all, your decision is not going to be influenced, not even by a tiny, tiny bit.  Can you honestly tell me that?

Juror 3:  I fully understand.

The Court:  Are you able to honestly tell me that it will not affect your decision at all?

Juror 3:  That's correct.

*Id.* at 20–21.  After the colloquy, the defense maintained that Juror 3 should be excused because he had been evasive; he had not committed to following the instruction until being asked several times; "[i]t is concerning that he stated that he didn't hear the instructions since it was given multiple times and really emphasized by [the Court]"; he had not clearly committed to following the instruction; and defense counsel "found the foreperson to be quite credible" in raising the concerns. *Id*. at 23.  Agreeing that Juror 3 had been evasive in his answers about whether he would follow the instruction, the Court excused him.  *Id.* at 24–25.

Although the defense requested that Juror 3 be excused, Gutierrez now argues that his dismissal was improper.  Gutierrez relies on a declaration from Juror 3 stating that he was the lone holdout in favor of acquittal; that he only casually asked, "I wonder why the defendant didn't testify"; and that he "believe[s] the other jurors used [his question] as an excuse to kick [him] off the jury." Dkt. No. 273.  In light of this new information, Gutierrez argues that Juror 3 did not engage in misconduct justifying his dismissal and that the foreperson mischaracterized his statement to get him removed in violation of Gutierrez's right to a unanimous jury.  *See United States v. Litwin*, 972 F.3d 1155, 1169 (9th Cir. 2020) ("[R]emoving a juror merely because she disagrees with her fellow jurors on the proper outcome of the case would provide an obvious endrun around the unanimous jury verdict guarantee.").

a.

As an initial matter, the Court addresses whether it may consider Juror 3's declaration under Federal Rule of Evidence 606(b), which provides that, during an inquiry into the validity of a verdict, a court may not receive a juror's affidavit about any "statement made or incident that occurred during the jury's deliberations."  Gutierrez argues that Juror 3's declaration falls outside the scope of Rule 606(b) because he was not on the jury that ultimately delivered the verdict,

such that his declaration did not address any statements made in deliberations that resulted in a verdict. Gutierrez cites no authority for the proposition that Juror 3 was not a "juror" within the meaning of Rule 606. Indeed, the Ninth Circuit has rejected the distinction between inquiries into juror dismissal and inquiries into the validity of the verdict, finding that both are covered by the rule. *See United States v. Christensen*, 828 F.3d 763, 814 (9th Cir. 2015) (affirming that Rule 606(b) precluded district court's consideration of "statements made during deliberations" prior to a juror's dismissal) (citing *United States v. Decoud*, 456 F.3d 996, 1018–19 (9th Cir. 2006)); *see also Warger v. Shauers*, 574 U.S. 40, 49 (2014) ("[T]he 'inquiry' to which [Rule 606(b)] refers is one into the '*validity* of the verdict,' not into the verdict itself.") (emphasis in original).

Gutierrez additionally argues that Juror 3's testimony is not barred by Rule 606(b) because he could have brought the information in his declaration to the Court's attention during the proceedings. *See Tanner v. United States*, 483 U.S. 107, 127 (1987) ("[J]urors are observable by each other, and may report inappropriate juror behavior to the court *before* they reach a verdict.") (emphasis in original). Gutierrez does not identify any authority that would have permitted Juror 3 to tell the Court—in violation of the jury instructions—that he was the sole holdout for acquittal. *See* Dkt. No. 213 at 13 (prohibiting jury from telling Court how the jury stands). Regardless, Rule 606(b) is specifically directed at prohibiting *post-verdict* inquiries into the validity of a jury's decision, in contrast to Rule 606(a), which allows juror testimony during a trial. *See Tanner*, 483 U.S. at 120 ("Allegations of juror misconduct, incompetency, or inattentiveness, raised for the first time days, weeks, or months after the verdict, seriously disrupt the finality of the process."). Even if Juror 3 could have presented the information in his declaration to the Court during trial, the Court may not now consider it in connection with a challenge to the verdict.

Accordingly, the Court finds that Juror 3's declaration is barred under Rule 606(b) and does not consider it. Because Gutierrez's argument is predicated entirely on the declaration, he is not entitled to a new trial on that basis.

b.

Even if the Court were to consider the declaration, Gutierrez has not shown that the dismissal of Juror 3 (at his request) was improper.[4] A court may dismiss a

---

[4] Gutierrez's challenge additionally fails under the invited error doctrine. By requesting that the Court dismiss Juror 3, the defense invited the error it now

juror for good cause after the jury begins deliberations, Fed. R. Crim. P. 23(b)(3),
although it may not do so "if the request for discharge stems from doubts the juror
harbors about the sufficiency of the evidence." *United States v. Symington*, 195
F.3d 1080, 1085 (9th Cir. 1999) (cleaned up). "[I]f the record evidence discloses
any *reasonable* possibility that the impetus for a juror's dismissal stems from the
juror's views on the merits of the case, the court must not dismiss the juror." *Id.* at
1087 (emphasis in original).

Gutierrez identifies nothing in the record before the Court at the time it
dismissed Juror 3 that made the decision improper.[5]  To the contrary, the record
demonstrates that the impetus for Juror 3's dismissal was his violation of the clear
instruction not to consider Gutierrez's failure to testify and his evasiveness in
answering the Court's questions about whether he would be able to follow the
Court's instructions—not his substantive views about the merits of the case.  When
the Court asked Juror 3 whether he had heard its instruction that the jury was not to
consider Gutierrez's lack of testimony in its deliberations, he did not give a
straightforward answer, stating that he was "not clear exactly what [the Court]
said," Dkt. No. 248 at 19, and that he was "not a lawyer," *id.* at 20.  Only after
being asked three times whether he would follow the instruction did he answer in
the affirmative.  *Id.* at 20–21.  Defense counsel voiced her concerns about this
evasiveness, emphasized the foreperson's credibility,[6] and requested that he be

_____

complains of and intentionally relinquished a known right. *See United States v.
Perez*, 116 F.3d 840, 845 (9th Cir. 1997) ("If the defendant has both invited the
error, and relinquished a known right, then the error is waived and therefore
unreviewable.").  Gutierrez's repeated requests that Juror 3 be dismissed made
clear that he had considered the implications of his position and made the requests
knowingly and intentionally "for some tactical or other reason." *United States v.
Magdaleno*, 43 F.4th 1215, 1220–21 (9th Cir. 2022); *see* Dkt. No. 248 at 3, 15, 23–
24 (defense arguments for dismissal of Juror 3).

[5] The cases cited by Gutierrez suggest that the Court looks to the record before it at
the time the juror was dismissed to determine if its decision was proper.  *See
Symington*, 195 F.3d at 1085–86 ("When a request for dismissal stems from the
juror's view of the sufficiency of the evidence, a judge may not discharge the
juror . . . .  The question here is what evidentiary standard the district court ought to
employ in making that determination.") (cleaned up).

[6] Gutierrez argues that Juror 3's declaration shows that the foreperson inaccurately
described Juror 3 as having based his reasoning on the defendant's decision not to
testify.  Dkt. No. 270 at 7.  Even if the Court could consider the declaration, it

dismissed.  The Court, which had no insight into Juror 3's views on the case, dismissed him due to his failure to follow its instructions and his evasive answers. *Id.* at 24.  Gutierrez has not shown that the dismissal was improper.  *See United States v. Vartanian*, 476 F.3d 1095, 1098–99 (9th Cir. 2007) (finding district court did not abuse its discretion by dismissing a juror who was untrustworthy and not forthcoming).

Accordingly, the Court's dismissal of Juror 3 does not warrant Rule 33 relief.

2.

Gutierrez next argues that the Court improperly seated an alternate juror who was apprehensive about staying in downtown Los Angeles and that the reconstituted jury failed to start its deliberations anew, rendering a verdict in less than 12 minutes.

The dismissal of Juror 3 required his replacement with an alternate juror. Because it had been brought to the Court's attention that the next alternate, Alternate 2, had an interaction with an audience member the day before, the Court questioned her about that interaction before installing her on the jury.  Alternate 2 explained that someone who had been observing the trial had asked her, "Are they about to wrap it up?" and that she felt "a little unsafe" because the bailiff did not accompany the jurors when they came up to the courtroom.  Dkt. No. 248 at 27–28.  She further stated that she would be able to deliberate without the interaction influencing her in any way but that she generally felt unsafe walking to and from the courthouse in downtown Los Angeles and was "very anxious" about being away from her family.  *Id.* at 28–30.  After the defense expressed concern that Alternate 2 would rush deliberations to get back to her family, the Court called her back in and directly asked her whether she would deliberate for as long as necessary and not cut deliberations short.  *Id.* at 32–34.  She confirmed that she would do so.  *Id.* at 33–34.  The Court then seated Alternate 2 and instructed the jury that it was required to start its deliberations anew.  *Id.* at 36–37; *see* Fed. R. Crim. P. 24(c)(3) ("If an alternate replaces a juror after deliberations have begun,

---

would merely create a conflict between the accounts of Juror 3 and the foreperson; it does not establish that the foreperson (whom defense counsel characterized at the time as "quite credible") was the one who misrepresented what happened.  *See Decoud*, 456 F.3d at 1019 (finding declaration inadequate where allegations were "speculative and vague").

the court must instruct the jury to begin its deliberations anew."). Less than twelve minutes later, the jury returned its guilty verdict.

Gutierrez argues that the Court erred in seating Alternate 2 because she was visibly distressed and had expressed concern about staying in downtown Los Angeles and being away from her family. However, Alternate 2 unequivocally stated that she would deliberate for as long as necessary and not cut deliberations short for personal reasons. Dkt. No. 248 at 33–34. And unlike Juror 3, Alternate 2 was direct in her responses to the Court's questions. *See id.* at 33 (Q: "[W]ould you fulfill that obligation if in fact you were substituted in?" A: "Yes, sir. I know it's the law."). Gutierrez has not shown that the Court's acceptance of Alternate 2, and its implied finding that she properly could serve as a fully deliberating juror, was erroneous.

Gutierrez also contends that the jury failed to restart its deliberations as instructed, pointing to the fact that the jury had previously deliberated for 9 hours but deliberated for less than 12 minutes before returning a verdict. The defense argues that "[w]hat happened is fairly obvious": the jury had "shed the holdout vote, and having received a distressed juror anxious to go home, flouted the Court's instruction to begin deliberations anew." Dkt. No. 270 at 12–13.

The Court presumes that the jury followed the instruction to begin deliberations anew. *See United States v. McFarland*, 34 F.3d 1508, 1514 (9th Cir. 1994) ("The district court in this case instructed the newly reconstituted jury to begin from the beginning, and we should presume that the jury's deliberations conformed to this instruction."). Gutierrez identifies no direct evidence to the contrary, relying only on the timing of the jury's decision. But a jury is not required to deliberate for any set minimum amount of time, and courts reject inquiries into verdicts solely based on the amount of time the jury took to deliberate. *See Guar. Serv. Corp. v. Am. Employers' Ins. Co.*, 893 F.2d 725, 729 (5th Cir. 1990) ("If the evidence is sufficient to support the verdict, the length of time the jury deliberates is immaterial.") (cleaned up); *id.* (rejecting challenge to verdict returned after only ten minutes of deliberation); *see also Aslan v. Ferrari N. Am., Inc.*, No. 16-CV-02574-AB, 2019 WL 13036841, at *2 (C.D. Cal. July 25, 2019) (collecting cases rejecting challenges to verdicts based on the brevity of the jury's deliberations).

Gutierrez relies heavily on *United States v. Lamb*, 529 F.2d 1153 (9th Cir. 1975) (en banc), to argue that the timing here shows that the jury did not begin deliberations anew. In *Lamb*, the jury originally took four hours to render a guilty

verdict.  Believing the verdict was inconsistent with the instructions, the district court refused to accept the jury's findings.  After receiving a note from a juror who stated she was emotionally unable to deliberate, the court recalled a discharged alternate juror, seated the alternate on the jury (over a defense objection), and told the jurors to start their deliberations again.  The reconstituted jury took 29 minutes to render a verdict.  The Ninth Circuit held that the district court committed reversible error by recalling and seating the discharged alternate, which violated Rule 24(c).  In dicta, it noted:

> [T]hat there was not the conscientious, careful reconsideration by the twelve of the newly constituted jury would seem apparent from the fact that, despite the district judge's instruction to the jury to "begin at the beginning," a jury that had required almost four hours to reach its initial verdict needed, after being reconstituted, only twenty-nine minutes to find the appellant guilty a second time.

*Id.* at 1156.  The court specifically stated, however, that the 29-minute deliberation period was "not a factor contributing to [its] conclusion" and that the "period of time during which the substitute juror participated in the deliberations [was] essentially irrelevant."  *Id.* at 1156 n.7.

Here, unlike in *Lamb*, there was no violation of Rule 24(c).  The dicta in *Lamb*—on which the court expressly disclaimed reliance—does not require a new trial.  Indeed, Gutierrez does not identify a single case in which the timing of deliberations alone justified a new trial, in contravention of the ample authorities to the contrary.  Given the strength of the government's case, the lack of case complexity, and the absence of evidence that the reconstituted jury failed to restart its deliberations, the Court declines to overturn the verdict based solely on the length of the deliberations.

## B.

The defense next argues that the government made several improper arguments in its rebuttal closing argument.  Because the defense did not object to any of these arguments at trial, the court must determine whether the government's conduct constituted plain error.  *United States v. Del Toro-Barboza*, 673 F.3d 1136, 1150 (9th Cir. 2012).  Under plain-error review, there must be an error that is plain and affects substantial rights.  *Id.* at 1146.  Even if there was plain error, "a conviction can be reversed only if, viewed in the context of the entire trial, the impropriety seriously affected the fairness, integrity, or public reputation of

judicial proceedings." *United States v. Geston*, 299 F.3d 1130, 1135 (9th Cir. 2002).

Gutierrez contends that a new trial is warranted because the government: (1) denigrated defense counsel, and (2) improperly vouched for Feusier's credibility.[7]  The Court addresses each argument in turn.

1.

During his closing argument, defense counsel forewarned the jury that the government would argue in rebuttal that he was "[t]hrowing out [] paranoid conspiracy theories" and that the jury should not believe what he said.  Dkt. No. 244 at 121.  In its rebuttal, the government responded:

> Ladies and gentlemen of the jury, what we just saw and what we just heard is the defense throwing anything and everything against the wall with the hopes that something will stick.  Now, [defense counsel] said that I would say as much, and that's because he knows exactly what he just did.  He used mischaracterizations, confusing the timeline, confusing the testimony you heard, and asked you to speculate.  Nothing that he said is supported by the evidence in this case.

Dkt. No. 244 at 127–28.  Gutierrez characterizes this argument, as well as the government's repeated descriptions of the defense's arguments as "distractions," as ad hominem attacks that improperly denigrated defense counsel and amounted to calling the defense a sham.  *See id.* at 128, 133, 142, 146, 154, 158, 165; *United States v. Sanchez*, 176 F.3d 1214, 1224–25 (9th Cir. 1999) (reversing conviction where government "denigrated the defense as a sham" in addition to vouching for witnesses and arguing that the jury had a duty to find the defendants guilty).

Gutierrez has not shown that the government engaged in misconduct, let alone that any impropriety rises to the level of plain error.  As the government points out, courts have found similar and even more aggressive comments to be "within normal bounds of advocacy."  *United States v. Tomsha-Miguel*, 766 F.3d 1041, 1047 (9th Cir. 2014) (arguments that defense counsel was "trying to distract"

---

[7] Gutierrez also argues that there was insufficient evidence for the government to argue in rebuttal that fentanyl caused death or serious bodily injury.  This argument fails for the same reasons that the Rule 29 motion fails.

and "trying to confuse" the jury were "within normal bounds of advocacy"); *see also United States v. Ruiz*, 710 F.3d 1077, 1086–87 (9th Cir. 2013) (characterization of defense case as "smoke and mirrors" not improper); *Williams v. Borg*, 139 F.3d 737, 745 (9th Cir. 1998) (referring to defense argument as "trash" not improper). In context, the government's arguments that the defense "used mischaracterizations," "confuse[d] the timeline," and employed "distractions," were not ad hominem attacks directed at defense counsel; they instead challenged the strength of defense counsel's arguments. Such language was not particularly inflammatory and did not render the trial fundamentally unfair.

2.

Gutierrez next argues that the prosecution improperly vouched for Feusier's credibility. "As a general rule, a prosecutor may not express his opinion of the defendant's guilt or his belief in the credibility of government witnesses." *United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993). Such vouching occurs when the prosecution "plac[es] the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggest[s] that information not presented to the jury supports the witness's testimony." *Id.* Courts consider various factors in determining whether vouching is improper:

the form of vouching; how much the vouching implies that the prosecutor has extra-record knowledge of or the capacity to monitor the witness's truthfulness; any inference that the court is monitoring the witness's veracity; the degree of personal opinion asserted; the timing of the vouching; the extent to which the witness's credibility was attacked; the specificity and timing of a curative instruction; [and] the importance of the witness's testimony and the vouching to the case overall.

*Id.* at 1278.

Gutierrez points to three instances of purported vouching in the government's rebuttal: (1) a reference to a report that was not admitted into evidence, (2) an argument about Feusier's plea agreement and cooperation, and (3) commentary about Feusier's criminal history.

17

a.

Gutierrez argues that the prosecution vouched for Feusier's truthfulness by referring to a law enforcement report that was used by the defense to impeach her credibility but was not admitted into evidence.

During its case in chief, the defense called Drug Enforcement Administration (DEA) agent Adam Kerr, who interviewed Feusier, and elicited testimony that his reports did not mention that she and Gutierrez picked up fentanyl from Matt, and that one report stated that Feusier sent the fentanyl to S.R. after Gutierrez left the house. Dkt. No. 267 at 60–64. In closing, defense counsel emphasized the statement in Kerr's report that Gutierrez had left by the time Feusier sent the fentanyl to S.R.:

> Do you remember when the DEA agent got up on the stand and we were talking to him about this story that Ms. Feusier made up about the golf-ball-sized piece of fentanyl? I asked him, "Isn't it true that . . . what Ms. Feusier said is that Mr. Gutierrez . . . had left the house before she packaged and sent the drugs to [S.R.]?" Agent Kerr said that Ms. Feusier said Mr. Gutierrez was not even home when she sent the drugs to [S.R].

Dkt. No. 244 at 82. In rebuttal, the government responded:

> Now, Defense also tried to make some hay out of the fact that in a DEA report a special agent wrote down that Feusier told him that, during that night, she met with the defendant, smoked fentanyl with him, he left, and she packaged the fentanyl for her friend [S.R.]. This is one line in a report, and it is not even inconsistent with what Feusier testified to. But the defense wants to point that out as an inconsistency, and tell you Feusier was lying on the stand. But that doesn't comport with reason. It completely is devoid of any context and doesn't give you any of the facts of what happened that night. It's one line in a report.
>
> . . .
>
> So I urge you to decline the invitation to be distracted or speculate about what that one line in an investigator's report could possibly mean. And don't forget about the context and the whole evidence that has been presented before you.

18

Dkt. No. 244 at 141–42.

Gutierrez argues that jurors may have concluded that the government knew
more about how accurately the report captured Feusier's statement because of the
prosecution's close connection to law enforcement.  He also contends that by
describing Feusier's statement as a single line in a report, the government relied on
evidence not in the record and "intended to create the impression that the report
contained additional information that rebutted defense counsel's arguments."  Dkt.
No. 315 at 9.

The government's argument, however, appeared to be a response to the
attempt to impeach Feusier's credibility and made no reference to the actual
contents of the report or any other information outside the record.  *Cf. United
States v. Combs*, 379 F.3d 564, 574 (9th Cir. 2004) (improper vouching where
prosecutor stated that law enforcement agent would have risked losing his job by
lying on the stand, which was not in the record).  The prosecutor asked the jury to
consider the line in the report emphasized by the defense in the context of the
totality of the evidence presented, pointing to Feusier's own testimony that
Gutierrez had left before she sent anything to S.R., and arguing that her testimony
was not inconsistent with the evidence that Gutierrez gave her the fentanyl.  *See*
Dkt. No. 243 at 183–84.  Allowing the argument was not error, much less plain
error.

b.

Gutierrez next argues that the government vouched for Feusier's credibility
by commenting on her cooperation and plea agreement:

> Yes, Feusier is a cooperating witness with the Government.  She told
> you that herself.  She signed an agreement to testify in this case.  But
> what you also know is that her cooperation is completely hinged on
> her coming here and telling the truth.
>
> . . .
>
> But you also know that she didn't receive some sort of massive
> benefit from the Government in exchange for her testimony here.
> That is also incredibly misleading and flies in the face of Feusier's
> testimony that she presented to you last week.  She told you that she
> was offered a plea agreement, or a plea offer, to something that would

reduce her sentence from 20 to life to a maximum of 20, but that this was completely separate and apart from her decision and the offer or invitation to cooperate in this case. It was separate and apart. And that makes it no different from any standard plea bargaining that you might be familiar with from TV or current events. It is not a benefit that Feusier received in order to testify against this defendant.

And again, "cooperating" means testifying about the truth. So her agreement to cooperate with the Government gives her no motive to say that it was the defendant who gave her the fentanyl that night, unless it's the truth.

Dkt. No. 244 at 143–44.

Gutierrez takes issue with the government's reference to plea bargaining that the jury "might be familiar with from TV or current events." Although "it is expected that jurors will bring their life experiences to bear on the facts of a case," *Hard v. Burlington N. R. Co.*, 870 F.2d 1454, 1462 (9th Cir. 1989), the government should avoid inviting the jury to consider information outside the record. While the Court would have sustained an objection, particularly because it cannot be said that the terms of a "standard plea bargain" are commonly and correctly known, the Court does not find that the prosecutor's argument impacted the fairness of the proceedings. The jury heard fully about Feusier's agreements with the government, and Gutierrez relied on them to vigorously attack her credibility. Considered in the context of the trial as a whole, the brief reference to "TV or current events" was not so prejudicial as to warrant a new trial.

Gutierrez also contends that the government used its prestige to present itself as the authority on how cooperation plea agreements work and thereby improperly suggested that Feusier had been truthful. He argues that the government's statement that Feusier's plea agreement was "not a benefit [she] received in order to testify against [Gutierrez]" misleadingly conflicted with the jury instructions, which specifically provided that Feusier had "received benefits from the government in connection with this case." Dkt. No. 213 at 8.

Though there is some concern that the government's statements could be construed in a way that contradicts the jury instructions and could cause jury confusion, the statements do not warrant granting a new trial. First, the government's statements were made after the defense attacked Feusier's credibility by pointing to her cooperation and plea agreements. *Id.* at 74–77. Under Ninth

20

Circuit law, the government was permitted to respond to the defense's credibility attack by arguing that Feusier was required to tell the truth. *See United States v. Dorsey*, 677 F.3d 944, 953 (9th Cir. 2012) ("[R]eferring to a plea agreement's mandate to be truthful does not constitute vouching for a witness if such references are made in response to an attack on the witness's credibility because of his plea bargain.") (cleaned up). In addition, the government's statements properly directed the jury's attention to evidence in the record and Feusier's own testimony that her cooperation agreement was separate and apart from her plea offer. *See* Dkt. No. 243 at 200–02.

Moreover, even if the statements did cross the line into vouching, they did not seriously prejudice Gutierrez. While Feusier's testimony was certainly critical to the government's case, other factors militate against granting a new trial. The government did not solely rely on Feusier's testimony—it also presented contemporaneous messages she had sent to Gutierrez and S.R., as well as other documentary evidence demonstrating that S.R. retrieved the fentanyl from Feusier. *See supra* Section II.A; Tr. Ex. 103 (surveillance video of S.R. retrieving fentanyl); Tr. Ex. 111 (Uber records indicating Feusier sent fentanyl to S.R.); Tr. Ex. 120 (Cashapp records showing $60 transaction between Feusier and S.R.). In addition, the Court finds that the jury instructions—which explicitly stated that Feusier had received a benefit from the government and warned that closing arguments are not evidence—were sufficient to neutralize any impropriety, especially given that the defense vigorously cross-examined Feusier about her plea agreement and challenged her credibility in closing. *See Necoechea*, 986 F.2d at 1280 (finding standard instructions sufficient to prevent miscarriage of justice where witness's credibility was "forcefully challenged" at trial); *cf. Combs*, 379 F.3d at 575 (finding general instructions insufficient where no "forceful challenge" to witness's credibility and circumstantial evidence "was not strong").

Viewing these rebuttal statements in the context of the entire trial, the Court finds that even if they rose to the level of improper vouching, they were not so egregious as to seriously affect the fundamental fairness of the trial. Thus, Gutierrez is not entitled to a new trial based on plain error.

c.

Finally, Gutierrez contends that the government vouched for Feusier by downplaying the seriousness of her criminal history:

21

> Defense counsel characterizes [Feusier's criminal history] as her just committing crime after crime after crime, and they are crimes, certainly, but you have to look at the nature of these crimes. It's her drug use and her continued drug use that were the violations. That's exactly what you would expect from somebody like Feusier. She's addicted to drugs, and she continued to use drugs.

Dkt. No. 244 at 150.

Gutierrez has not shown that these statements crossed the line into prosecutorial misconduct. The government was responding to the defense's argument that Feusier was not credible because she lied about using drugs while on pretrial supervision. *Id.* at 72–73. It did not deny that Feusier had committed crimes but instead invited the jury to consider the broader context of her criminal history and her drug addiction. Such statements were not personal guarantees of Feusier's veracity or personal opinions about the severity of her crimes. *Cf. United States v. Kerr*, 981 F.2d 1050, 1053–54 (9th Cir. 1992) (finding misconduct where prosecutor personally vouched for witness by stating, "I think he was very candid" and "I think he was honest."). Gutierrez has not shown that allowing this argument was error, let alone plain error.

In sum, Rule 33 relief is not warranted based on the government's rebuttal closing argument. Even considering all the purportedly improper statements as a whole, the Court does not find that they so seriously affected the fairness of the proceedings as to warrant a new trial.

## C.

Finally, Gutierrez contends that a new trial is necessary because the Court erred in limiting his ability to cross-examine Feusier about Gutierrez's knowledge of S.R. Without the ability to cross-examine Feusier about whether he knew about S.R., Gutierrez argues, the defense was not able to explore whether Feusier took the fentanyl without his knowledge. During Feusier's cross-examination, the Court sustained several objections to testimony and questioning about Gutierrez's knowledge of S.R.:

> Q. Actually, what you told the prosecutors was that Mr. Gutierrez left the house before you sent anything to [S.R.], right?
>
> A. Yes. He had no idea that I was doing that.

22

Q.  Got it.

Government Counsel:  Objection, Your Honor.  I would ask to strike the last part as nonresponsive.

The Court:  Sustained.  The jury should disregard everything in the response other than "yes."

Q.  Mr. Gutierrez had no idea what you were doing, right?

Government Counsel:  Objection, Your Honor, 403 and the Court's prior rulings.

The Court:  I'm going to sustain it on vagueness grounds.  I understand you're marching off of her answer, but it's vague.

Defense Counsel:  Yes, Your Honor.

Q.  A couple of seconds ago you said that Mr. Gutierrez had no idea what you were doing when you said that.  You're referring to you sending fentanyl to [S.R.], correct?

Government Counsel:  Objection, Your Honor, 403 and the Court's prior ruling on this matter.

The Court:  I am going to sustain it, and we could address it later in terms of its legal implication with regard to the elements of the offense.

Dkt. No. 243 at 183–84.

Before trial, the Court granted the government's motion in limine to exclude precisely this kind of questioning and evidence about whether S.R.'s death was foreseeable to Gutierrez.  Dkt. No. 117 at 2.  The defense did not oppose the motion but reserved the right to argue other theories that "may refer to the fact that Mr. Gutierrez did not personally distribute fentanyl to S.R."  Dkt. No. 95 at 7–8.  In its submission, the defense did not dispute that, under Ninth Circuit law, the government did not need to prove that Feusier's distribution to S.R. was foreseeable to Gutierrez.  *Id.*; *see Houston*, 406 F.3d at 1122–23.

Because the defense's line of questioning, which inquired into whether Gutierrez knew that Feusier was going to send the fentanyl to S.R., fell within the scope of the motion in limine, the Court properly sustained the government's objections.  Allowing the defense's questioning would have posed a high likelihood of jury confusion—the jury could have been misled into thinking that the government did need to prove foreseeability.  *See* Fed. R. Evid. 403.  While a

defendant has a right to a meaningful opportunity to present a complete defense, that right is not unlimited and is subject to evidentiary and procedural rules. *Moses v. Payne*, 555 F.3d 742, 757 (9th Cir. 2009) (citing *United States v. Scheffer,* 523 U.S. 303, 308 (1998)). Here, the Court appropriately limited the defense's cross-examination to questioning permitted under the evidentiary rules.

Moreover, Gutierrez was not completely foreclosed from developing his arguments about knowing distribution. Indeed, he elicited other testimony from Feusier on the topic of knowing distribution, cross-examined her about her credibility, and argued in closing that Feusier's story about Gutierrez's knowing distribution was unreliable. *See, e.g.*, Dkt. No. 244 at 68–69, 82–86. The Court's rulings did not deprive him of the opportunity to present a full defense.

Gutierrez's Rule 33 motion is denied.

IV.

Because there was sufficient evidence for a rational juror to find that Gutierrez knowingly distributed fentanyl that caused death or serious bodily injury, and because he has not demonstrated grounds for a new trial, his motions are denied.

Date: February 11, 2025

_____
Stanley Blumenfeld, Jr.
United States District Judge